[Civ. No. 7396. First Appellate District, Division One.—May 29, 1931.]

C. L. WOLD et al., Appellants, v. LEAGUE OF THE CROSS OF THE ARCHDIOCESE OF SAN FRANCISCO, INCORPORATED (a Corporation) et al., Respondents.

Aitken & Aitken for Appellants.

Garret W. McEnerney and John G. Jury for Respondents.

DOOLING, J., *pro tem.*—This is an appeal from a portion of a judgment denying plaintiffs and appellants recovery on the first count of their complaint by which they sought to recover $2,025 as rent. Respondent, League of the Cross of the Archdiocese of San Francisco, Incorporated, was the tenant in possession of appellants' building and the other respondents are sued as stockholders of such tenant for their proportionate liability. It is undisputed that respondent corporation, which for convenience will be referred to as the tenant, had been in possession of the building, under a lease providing for the payment of rent at the rate of $225 per month, which lease contained the customary provision that "should the lessee hold over the term herein created such tenancy shall be from month to month only and put on the same terms and conditions as herein stated". This lease was expressed to be for a term ending February 28, 1928. On February 17, 1926, this lease was modified by an agreement under which the tenant forthwith paid $1800 in full for rent due and to become due and the term of the lease was shortened so that it would terminate on October 30, 1926. On the latter date the tenant did not quit the premises, but continued in possession, and the court found that possession was surrendered on August 2, 1927. Appellants by the first count of their complaint are seeking to recover rent at the rate of $225 per month from November 1, 1926, to August 1, 1927. The judgment for respondents on this count is grounded chiefly on the following finding: "That defendant corporation did not surrender said premises, nor was any surrender of the same demanded by plaintiffs, but on or about November 21, 1926, the defendant corporation, through its officers, informed C. L. Wold, one of the plaintiffs herein, that it did not have sufficient funds to pay plaintiffs' rental for any additional period of time beyond October 30th, 1926, and had no feasible way of paying such rentals and that defendant corporation would have to give up possession of said premises unless it could

receive an allotment from the Community Chest of San Francisco for the year 1927 and informed said plaintiff that there was a possibility that said League would have sufficient funds to pay the rental for an additional period of time when the allotments were made by said Community Chest for 1927; that although plaintiffs did not agree in express terms to defendants' continuance in possession of said premises until said Community Chest application had been determined, they acquiesced in and agreed to the proposal that defendant corporation remain in possession and that rentals to accrue during the time following October 30, 1926, be paid at the time of such contemplated allotment by said Community Chest and out of the moneys allotted to said League for the year 1927, and moreover, agreed to lend aid to defendants in procuring said allotment;''

No such allotment was ever made to the tenant by the Community Chest for 1927 and the court further found ''that all hope of defendant corporation securing help from the Community Chest expired on or about April 26, 1927''.

It is appellants' chief contention on appeal that the evidence does not support the finding first above quoted, to wit: that they agreed that the tenant should pay rent only if it received aid from the Community Chest.

In considering the evidence relied upon by respondents to support this finding it is, of course, axiomatic that the evidence should be construed most strongly in support of the finding and that if conflicting inferences may reasonably be drawn from the evidence that inference must be indulged which will support the finding and uphold the action of the trial court. In order therefore to dispose of the question of the sufficiency of the evidence, we feel compelled to quote therefrom rather freely.

Phil. H. Crimmins, a witness for respondents, testified in part: ''I would say that some time in the latter part of November or the early part of December, 1926, I called on Mr. Wold at his office and informed him that we were putting in a budget again for 1927 and that we didn't know whether we were going to get it through. . . . That was the only money we had to look forward to. . . . I called on Mr. Wold alone several times and he phoned me several times. This was all in November or December of 1926. . . . I don't remember the exact conversations had with Mr. Wold except

that I told him that at times things looked pretty good for us getting the money from the Community Chest and then at other times it didn't look so good. On one of these occasions Mr. Wold rang up some official in the Bank of Italy to see if he could put in a good word for us to get the money. Later on, probably in January, I told him that we would have to move out if we could not get the money. I told him then that if the League could not get the money from the Community Chest I didn't see how it could pay the rent. For several years the Community Chest was the only source of revenue that the League of the Cross had. . . . Mr. Wold did not demand possession of the property from me in any of the conversations mentioned. I saw Mr. Wold on an average of every two weeks after the lease expired. Mr. Wold was in my office two or three times prior to January of 1927 and after October 30th, 1926. Mr. Wold came down to see if there was any money in sight. He did not ask that the property be given back if it was not paid. Mr. Wold was interested in knowing whether we would get money from the Community Chest. That was the understanding all the time. There was no demand made on me at any time for the surrender of possession of the building.''

H. L. Leonard testified in part: ''I recall a conversation with Mr. Wold in either November or December of 1926. The conversation was in Mr. Wold's office, there being present, Mr. Wold, myself and Mr. Crimmins. We had just returned from a meeting of the Boys' Welfare Committee of the Community Chest and we went to Mr. Wold's office to tell him that we had been there and had presented our budget to the Community Chest. The only matter discussed at that time was the possibility of our getting into the Chest. Mr. Wold volunteered to try to help us to get into the Chest and at the time we were there he tried to get someone on the phone to talk with them about the matter but I believe he was unable to get the party at the time but he volunteered to help. We told Mr. Wold the funds to pay the rent would have to be derived from the Community Chest; that we had no funds of our own other than that and that the funds to pay for any rent would have to be derived from the Community Chest. Mr. Wold seemed to be satisfied with that understanding, and after that the matter was not discussed at length. He did not demand at that time

nor at any time did he make any demand from me personally for possession."

Appellant C. L. Wold testified on cross-examination: "Q. Mr. Crimmins told you that if they could not get the Community Chest money they would have to move out, did he not, at the time he called? A. Something to that effect. . . . Q. What did he—what did you say then? A. Well, what could I say. I didn't have nothing to say. They had the privilege to move out if they could not pay rent. . . . Q. As you say, he said that the League of the Cross depended upon that, and they would have to move out if they could not get it? A. Yes. Q. But you did not tell them to move out, did you? A. Well, I did not have no reason to tell them to move, so long as they were willing to stay; I felt that they were responsible for the rent, so I didn't tell them to move out."

Beginning February 2, 1927, appellant C. L. Wold personally and through his agents, Buckbee, Thorne & Co., wrote a series of letters to the tenant demanding payment of the rent. In none of these letters was there any suggestion of an existing agreement to pay rent only if funds were received from the Community Chest. To the earlier of these letters no reply was made, and in the replies to the later ones it was never suggested or stated that such an agreement had been made or that the tenant was not liable for the rent. On or about June 28, 1927, Leonard, in a letter to Buckbee, Thorne & Co., made this statement:

"Our tenancy of the building would have been terminated sooner had we not always been under the impression that the organization would have been included in the Community Chest, and it was not until April that we were informed that a budget had been denied us . . . I really feel that the Community Chest is morally responsible for the headquarters' rent on account of the way in which the matter was handled.

"The matter of adjustment is being handled by Jas. McEntee and Colonel Mahoney and I will immediately get in touch with them in the matter and have them confer with yourself or Mr. Wold in the hope that matters may be straightened out in a satisfactory manner."

From this fact picture certain conclusions are clear. There was never in express terms a proposal to appellants

that the tenant should remain in possession under an agreement to pay rent only if money was received from the Community Chest. Such a proposal, if one was made, must be implied from the words and conduct of the parties. Nor was there any acceptance of such proposal, if such a proposal may be fairly implied, by any express words of appellant, C. L. Wold. Such acceptance, if any there was, must likewise be implied from the silence and inaction of C. L. Wold. To support the finding that such a contract was entered into both the offer and the acceptance, which are necessary to the formation of every true contract, must be implied. This much is admitted by respondents. But they contend that such an offer may be fairly implied from the conduct and statements of the tenant's representatives, and that the acceptance of that implied offer may be fairly implied from appellants' silence and inaction.

■ Ordinarily mere silence or inaction in the face of the offer of a contract cannot amount to an acceptance. The circumstances must be such as to impose upon the offeree a duty to speak if he is to be held bound to a contract by remaining mute. "Silence alone does not give consent, even by estoppel, for there must not only be the right, but the duty, to speak before the failure so to do can estop a person from afterward setting up the truth." (13 C. J., p. 276; *Royal Ins. Co.* v. *Beatty,* 119 Pa. 6 [4 Am. St. Rep. 622, 12 Atl. 607]; *More* v. *New York Bowery Fire Ins. Co.,* 130 N. Y. 537 [29 N. E. 757]; *Bank of Buchanan County* v. *Continental Nat. Bank of Los Angeles,* 277 Fed. 385, 390; *In re Baum's Estate,* 274 Pa. 283 117 Atl. 684].) In *Leslie* v. *Brown Brothers Inc.,* 208 Cal. 606 [283 Pac. 936, 942], our Supreme Court said at page 621:

"O'Brien did not reply to nor in any manner manifest acceptance of the terms stated in said letter. His silence, unaccompanied by any act, was not sufficient to indicate that the question of the possession and ownership of said securities was a closed incident in appellant's favor. We quote from 13 Corpus Juris, 276:

"'An offer made to another, either orally or in writing, cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, for the

offerer cannot prescribe conditions of rejection so as to turn silence on the part of the offeree into acceptance.' "

See to the same effect, *Columbia Malting Co.* v. *Clausen-Flanagan Corp.*, 3 Fed. (2d) 547, 551; *Felthouse* v. *Bindley*, 142 Eng. Reprint, 1037; *Prescott* v. *Jones*, 69 N. H. 305 [41 Atl. 352].

Under the rule above announced by our Supreme Court, if strictly applied, the silence of appellants would not have resulted in a contract even though Crimmins and Leonard had expressly stated that they would not continue in the occupancy of the premises unless Wold would agree that rent should be paid only from Community Chest funds; nor, indeed, if they had stated further that if Wold did not reply they would take his silence for consent. We are not called upon, however, to pass upon this supposed situation since the facts here in evidence fall far short of it.

It is clear that only where the circumstances impose upon the offeree a duty to speak can his silence amount to an acceptance. As stated in *Cole-McIntyre-Norfleet Co.* v. *Holloway*, 141 Tenn. 678 [7 A. L. R. 1683, 214 S. W. 817, 818] (response to petition to rehear) : "They (the cases) all agree that acceptance of an offer may be inferred from silence. This is only where the circumstances surrounding the parties afford a basis from which an inference may be drawn from silence. There must be the right and the duty to speak, before the failure to do so can prevent a person from afterwards setting up the truth."

Wherein were there facts in this case to impose such a duty on appellants? The agents of the tenant at no time proposed unequivocally or in express terms that they should have the premises rent free unless they received aid from the Community Chest. The tenant was bound under the terms of the written lease to pay $225 per month so long as it held over. It at no time suggested, except by possible implication, that this written obligation should be modified. It simply suggested that it had no other source of revenue than the Community Chest and would have to move out if funds were not received from that source. To this suggestion appellants said nothing. It was not appellants' duty to ask the tenant to quit. They were entitled to stand on the obligation of the written lease at least until they were informed in some more definite and unequivocal fashion that

the tenant was proposing its oral modification. We cannot hold that the mere silence or inaction of a lessor can bind him to a modification of the terms of a written lease simply because the tenant tells him that he cannot pay the rent unless he receives money from a particular source, and respondents have been able to cite no authority which in our judgment would even remotely support such a holding. The conduct of the parties at the time is not sufficient to raise the implication of such a contract. The tenant's silence, in the face of appellants' earlier letters demanding rent, and its replies to the later letters likewise negative the existence of any such agreement.

The two cases chiefly relied on by respondents are radically different from this one. In *Cole-McIntyre-Norfleet Co.* v. *Holloway, supra,* a sales agent for defendant solicited an order from plaintiff, subject to confirmation by his principal. The court held that, having solicited the order from plaintiff, the defendant was under a duty to act upon it within a reasonable time under penalty of being bound. In *Hobbs* v. *Massasoit Whip Co.,* 158 Mass. 194 [33 N. E. 495], plaintiff had sent several shipments of skins to defendant, each of which had been accepted and paid for. A later shipment was received and held and the court ruled that by the previous course of conduct defendant, if it did not wish to buy the skins, was bound to reject them within a reasonable time.

It is true that in the previous year, being somewhat in arrears in the payment of rent, the tenant received $1800 from the Community Chest and at that time negotiated with appellants the modification of the lease by which it should terminate on October 30, 1926, and at the same time used the $1800 so received to pay the rent in full for the modified term. But we can see nothing in these facts which would impose a duty upon Wold to speak when, after the expiration of the term, Crimmins and Leonard made the statement to him that if they did not get aid from the Community Chest they would have to vacate the premises. Nor can the statements of Crimmins and Leonard that: "That was the understanding all the time", and "Mr. Wold seemed to be satisfied with that understanding", aid respondents. As said in *Nevills* v. *Moore Min. Co.,* 135 Cal. 561, 563, 564 [67 Pac. 1054, 1055]: "When the witness

said, 'I had an agreement with my partners with reference to compensation.' 'They understood that I was to get a salary,' 'I was to get a fair compensation,' and like expressions, the witness was but stating his conclusion.''

In view of our determination of this question, it perhaps becomes unnecessary to point out that even on respondents' theory no suggestion has been advanced why respondents should not be liable for rent between April 26, 1927, when the court found that all hope of defendant corporation securing help from the Community Chest expired, and August 2, 1927, when the court found the premises were finally surrendered.

The portion of the judgment appealed from is reversed.

Cashin, J., and Tyler, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 27, 1931, and a petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 27, 1931.