# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEFF POKORNY; LARRY BLENN;
KENNETH BUSIERE, on behalf of
themselves and those similarly
situated,
             *Plaintiffs-Appellees,*

             v.

QUIXTAR, INC.; JAMES RON
PURYEAR, JR.; GEORGIA LEE
PURYEAR; WORLD WIDE GROUP
LLC; BRITT WORLDWIDE LLC;
AMERICAN MULTIMEDIA, INC.; BRITT
MANAGEMENT, INC.; BILL BRITT;
PEGGY BRITT,
             *Defendants-Appellants.*

No. 08-15880

D.C. No.
3:07-CV-00201-SC

OPINION

Appeal from the United States District Court
for the Northern District of California
Samuel Conti, District Judge, Presiding

Argued and Submitted
October 6, 2009—San Francisco, California

Filed April 20, 2010

Before: Mary M. Schroeder and Marsha S. Berzon,
Circuit Judges, and Lyle E. Strom,* District Judge.

Opinion by Judge Schroeder

*The Honorable Lyle E. Strom, Senior United States District Judge for
the District of Nebraska, sitting by designation.

5973

## COUNSEL

Stuart H. Singer, Fort Lauderdale, Florida, for the plaintiffs-appellees.

William L. Stern, San Francisco, California, for the defendants-appellants.

## OPINION

SCHROEDER, Circuit Judge:

Defendant-Appellant Quixtar Inc. ("Quixtar"), the successor-in-interest to Amway Corporation, markets a variety of products and services that it sells to consumers through a network of individual distributors that it refers to as "Independent Business Owners" ("IBOs"). All of the IBOs signed on to agreements that included the mandatory alternative dispute resolution ("ADR") provisions that the district court held unconscionable. The other remaining Defendants-Appellants are senior IBOs: Bill and Peggy Britt are members of Britt Worldwide LLC, and owners of American Multimedia Inc. and Britt Management Inc. (collectively, the "Britt Defendants"); James and Georgia Puryear are members of World Wide Group LLC (collectively, the "Puryear Defendants"). Both the Britt Defendants and the Puryear Defendants produce and market "business support materials" and other services to junior IBOs.

Plaintiffs-Appellees are junior IBOs. Jeff Pokorny, Larry Blenn, and Kenneth Busiere (collectively, "Plaintiffs") are California residents who filed this litigation as a class action against Quixtar, the Britt Defendants, and the Puryear Defendants alleging they operate an illegal pyramid scheme in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and California Business and Professions Code §§ 17200 *et seq.* and 17500 *et seq.*

Relying on the mandatory ADR provisions included in its agreements with its IBOs, Quixtar, joined by the Britt and Puryear Defendants (collectively, "Defendants"), moved to

dismiss Plaintiffs' suit or, in the alternative, to stay the action and compel Plaintiffs to resolve their claims through Quixtar's ADR process. The district court denied Defendants' motion, holding that the ADR provisions of Quixtar's agreements with its IBOs are unconscionable under California law. Quixtar now appeals that interlocutory ruling pursuant to 9 U.S.C. § 16(a)(1)(B), and contends (1) that the district court should not have applied California law and (2) that it erred in holding that the ADR provisions are unconscionable. We affirm the well-reasoned decision of the district court.

## BACKGROUND

Quixtar is a Virginia corporation with its corporate headquarters in Michigan. It describes itself as a leader in the e-commerce business and maintains that it provides millions of Americans with the opportunity to own their own businesses as distributors of a variety of nutrition, beauty, household, and related products. These distributors, known as IBOs, earn immediate income by reselling products they purchase from Quixtar to consumers. Additionally, Quixtar awards monthly bonuses to IBOs dependent on the volume of their own product purchases, as well as on the volume of product purchases by any individuals they recruit and register as IBOs. Some senior IBOs also reap profits by producing and selling "business support materials" ("BSM") to junior IBOs. These include books, magazines, audio tapes, video tapes, meetings, and seminars designed to help IBOs manage their Quixtar businesses and recruit new IBOs.

An individual becomes a Quixtar IBO by submitting an application and entering into a registration agreement with Quixtar that must be renewed annually. The registration agreement includes an "Agreement to Arbitrate," which incorporates by reference the "Dispute Resolution Procedures" found in the Quixtar IBO Rules of Conduct. Pokorny first registered as an IBO in 1994, and both Blenn and Busiere became IBOs in 2005. IBOs who purchase BSM are also

encouraged to complete the "Business Support Materials Arbitration Agreement" ("BSMAA"), which likewise incorporates by reference the Dispute Resolution Procedures in the IBO Rules of Conduct. Both Pokorny and Blenn allegedly agreed to the BSMAA. It is the three-step ADR process mandated by the IBO Rules of Conduct and incorporated by reference in the Agreement to Arbitrate and the BSMAA that is at the heart of this appeal.

In 2007, Pokorny and Blenn, later joined by Busiere, filed this lawsuit against Defendants in the United States District Court for the Northern District of California, asserting claims under RICO on behalf of a proposed nationwide class of IBOs, and claims for unfair business practices and false advertising under California law on behalf of a proposed California class of IBOs. Plaintiffs allege that Defendants operate a two-tiered pyramid scheme that has scammed junior IBOs like themselves out of millions of dollars.

First, Plaintiffs assert that Quixtar and its senior IBOs, including the Britt Defendants and the Puryear Defendants, fraudulently induce individuals to become IBOs by promising them they will be able to resell Quixtar products for a profit, when in reality the price an IBO must pay for Quixtar products is so high that any profit through resale is virtually impossible. Further, once a new recruit becomes an IBO, the recruit is instructed to purchase Quixtar products only for the new recruit's personal use and to focus on recruiting and registering new IBOs, rather than to market and resell products to retail customers.

Second, Plaintiffs contend that Quixtar and its senior IBOs fraudulently induce junior IBOs to purchase BSM by telling them the BSM are necessary to the success of an IBO business and will help them realize tremendous wealth. But the main purpose of the BSM is actually to teach junior IBOs how to recruit and register new IBOs, not to assist IBOs in conducting their own successful Quixtar business. Although

this business model leads to great profits for Quixtar and its most senior IBOs, Plaintiffs allege it results in significant losses to junior IBOs.

Plaintiffs also allege that they are not required to follow the three-step ADR process outlined in the Quixtar IBO Rules of Conduct and mandated by the Agreement to Arbitrate and the BSMAA because it is unconscionable and therefore unenforceable. That process is as follows:

As the first step, the Rules of Conduct require an aggrieved IBO to attempt to resolve any dispute it has with another IBO or with Quixtar through a non-binding process of "Informal Conciliation." During Informal Conciliation, Quixtar's Business Conduct and Rules Department works with the affected parties to resolve the dispute. Quixtar equates Informal Conciliation to a "standard commercial mediation."

If Informal Conciliation does not end the dispute, the Rules of Conduct next require an aggrieved IBO to initiate the equally non-binding process of "Formal Conciliation," by requesting a hearing before the Independent Business Owners' Association International ("IBOAI") Hearing Panel. The IBOAI Hearing Panel is made up of three members of the IBOAI Board. Quixtar describes the IBOAI as "the voice of the IBO," and asserts that through its Board the IBOAI "provides an open channel of communication with [Quixtar] on all aspects of the business, taking an active role in shaping its future."

Although any IBO may join the IBOAI for a small annual fee, an IBOAI member may not participate in the election of Board members unless it has achieved the "Platinum" level of business generation that Plaintiffs maintain only the most senior IBOs can achieve. Plaintiffs were not members of the IBOAI, nor did they achieve the Platinum level.

During Formal Conciliation, the aggrieved IBO presents testimony and documentary evidence concerning its dispute to

the IBOAI Hearing Panel. According to the Rules of Conduct, "[t]he Hearing Panel's primary goal is to mediate or conciliate each dispute by determining the facts and issues and recommending to [Quixtar] any possible resolutions or remedy in accordance with the Rules of Conduct." The Rules of Conduct further state that the Hearing Panel's recommendations "must be consistent with the Rules of Conduct," and that "Hearing Panel members are bound by the Rules of Conduct as adopted by [Quixtar], and may not modify, alter, amend, or ignore the current positions of the Rules of Conduct." The Hearing Panel, in turn, may request review of the dispute by the IBOAI Board, which must then issue a recommended resolution to the parties and to Quixtar. Like the Hearing Panel's recommendation, however, the Board's recommendation "must be consistent with the Rules of Conduct," and the Board "may not amend, alter, modify, or ignore the clear provisions of the Rules of Conduct."

Once Quixtar receives a recommendation from the Hearing Panel or the IBOAI Board, it reviews the complete case file and, at its discretion, may conduct its own investigation into the dispute. Quixtar then issues a final decision accepting, reversing, or modifying the recommendation. The Rules of Conduct state that only Quixtar "may impose or act upon any of the actions and/or sanctions recommended by the Hearing Panel or [IBOAI] Board."

If an aggrieved IBO is not satisfied with the result reached through the non-binding conciliation process, the Rules of Conduct require the IBO to submit the dispute to binding arbitration. This step can be taken no sooner than 90 days after the IBO first notifies the other party of its claim, and must not be taken before the Informal and Formal Conciliation processes have been completed. Further, any demand for arbitration must be made "within two years after the issue has arisen, but in no event after the date when the initiation of legal proceedings would have been barred by the applicable statute of limitations." The Rules of Conduct govern all aspects of the

binding arbitration process, including how the arbitrator is selected and how costs and fees associated with the arbitration are assessed.

Because Plaintiffs did not participate in the three-stage ADR process mandated by the Rules of Conduct, Quixtar, joined by the Britt and Puryear Defendants, moved the district court to dismiss the complaint with prejudice or, in the alternative, to stay the action and compel Plaintiffs to resolve their claims through non-binding conciliation or binding arbitration. Plaintiffs opposed Defendants' motion, arguing that they never agreed to the ADR process outlined in the Rules of Conduct and that the contractual provisions purportedly requiring them to participate in it are unconscionable and therefore unenforceable. Defendants also maintained that Michigan law applies, even though Plaintiffs are all California residents, because Quixtar is headquartered in Michigan and the ADR provisions say Michigan law is to apply in arbitration.

The district court denied Defendants' motion. Applying California law, it held that both the non-binding conciliation and the binding arbitration portions of the Agreement to Arbitrate, the BSMAA, and the Rules of Conduct (collectively, the "Quixtar ADR agreements") are procedurally and substantively unconscionable. The court further determined that Quixtar's ADR process as a whole is "simply too tainted to be saved through minor adjustments" because it is "so permeated with unconscionable provisions" that severing the unconscionable provisions and enforcing the remaining ones "would have virtually no effect." It therefore ruled that the entire ADR scheme mandated by the Quixtar ADR agreements is unenforceable. Defendants timely appealed, and the district court granted their request to stay its proceedings pending the appeal. We have jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(B) to review the district court's denial of a petition to compel arbitration.

**DISCUSSION**

## I.   Choice of Law

Defendants first argue that the district court erred in applying California law to determine whether the Quixtar ADR agreements are unconscionable. We review de novo the district court's decision concerning the appropriate choice of law. *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 936 (9th Cir. 2001). We agree with the district court that California law applies, because Quixtar has failed to establish that Michigan has a legitimate interest in the application of its law under the circumstances of this case.

**[1]** Section 2 of the Federal Arbitration Act ("FAA") provides that arbitration agreements in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, "[i]n determining the validity of an agreement to arbitrate, federal courts 'should apply ordinary state-law principles that govern the formation of contracts.' " *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Before a federal court may apply state-law principles to determine the validity of an arbitration agreement, it must determine which state's laws to apply. It makes this determination using the choice-of-law rules of the forum state, which in this case is California. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).

**[2]** Under California law, the choice-of-law rules differ depending on whether the parties have included a choice-of-law agreement in their contract and, if so, whether the claims being litigated fall within the scope that agreement. *See Wash. Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1077, 1080 (Cal. 2001). In the district court, Defendants asserted that Michigan law, rather than California law, should apply, on the

basis of a choice-of-law clause in the Rules of Conduct stating that "the law of Michigan shall apply in all arbitrations under these rules." The district court rejected that argument because the question of whether the Quixtar ADR agreements are unconscionable does not fall within the scope of the choice-of-law clause. The court therefore applied the "governmental interest analysis" used by California courts when there is no controlling choice-of-law agreement. *See id.*

On appeal, Defendants concede in their opening and reply briefs that the governmental interest analysis applied by the district court is the correct choice-of-law test. Although they attempted to retreat from this position in a letter filed pursuant to Federal Rule of Appellate Procedure 28(j) and at oral argument, their efforts came too late and their argument for a different choice-of-law test was waived. *See Eberle v. City of Anaheim*, 901 F.2d 814, 817-18 (9th Cir. 1990). Therefore, in accordance with the Defendants' prior concession, we assume the district court applied the proper choice-of-law test.

Under the governmental interest analysis, California courts engage in a three-step process to determine whether a foreign state's law governs an issue in an action brought in California. *Wash. Mut. Bank*, 15 P.3d at 1080-81. The California Supreme Court has summarized the process:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law "to determine which state's interest would be more impaired if its

policy were subordinated to the policy of the other state[,]" and then ultimately applies "the law of the state whose interest would be the more impaired if its law were not applied."

*Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 922 (Cal. 2006) (quoting *Bernhard v. Harrah's Club*, 546 P.2d 719, 723 (Cal. 1976)) (internal citations omitted). The party advocating the application of a foreign state's law bears the burden of identifying the conflict between that state's law and California's law on the issue, and establishing that the foreign state has an interest in having its law applied. *Wash. Mut. Bank*, 15 P.3d at 1081. If it fails to meet either of these burdens, the court "may properly find California law applicable without proceeding to the third step in the analysis." *Id.*

The district court concluded at the first step of the governmental interest analysis that "there is a material difference between Michigan and California law regarding unconscionability," because "[w]hile Michigan law recognizes the availability of alternative goods, services, or employment as a defense to procedural unconscionability, California law does not." Plaintiffs argue that this difference is not material, and that we may affirm the district court's choice of California law because Defendants failed to carry their burden at the first step of the governmental interest analysis. We are not entirely convinced there is a material difference between the application of Michigan and California law with regard to the issue of procedural unconscionability on the facts of this case. Because of the unique nature of the IBO relationship, as portrayed by Quixtar's own marketing, there may be no available alternative arrangement within the meaning of Michigan law. *See Nw. Acceptance Corp v. Almost Gravel, Inc.*, 412 N.W.2d 719, 723 (Mich. Ct. App. 1987); *Allen v. Mich. Bell Tel. Co.*, 171 N.W.2d 689, 692-94 (Mich. Ct. App. 1969). Even if we assume there is a material difference, however, the district court properly concluded at the second step of the analysis that Defendants failed to establish that Michigan has a legiti-

mate interest in the application of its law to the circumstances of this case.

**[3]** Defendants contend that Michigan has an interest in applying its law of procedural unconscionability because Quixtar is headquartered in Michigan and Michigan has an interest in providing companies headquartered within its jurisdiction a uniform body of contract law on which they may rely nationwide. *Cf. Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 704 n.31 (Mich. 1995) (Michigan has an interest in regulating the conduct of two parties to a contract where one was a Michigan corporation and the other was a corporation headquartered in Michigan). Here, however, the three individuals seeking protection from the agreements at issue are all California residents with no discernable connection to Michigan. Michigan therefore has little to no interest in the application of its law of procedural unconscionability to Plaintiffs' challenge to the validity and enforceability of the Quixtar ADR agreements. *See* Restatement (Second) of Conflict of Laws § 188, cmt. c (1971). California, on the other hand, has a substantial interest in applying its law of procedural unconscionability to that issue. *See Int'l Bus. Machines Corp. v. Bajorek*, 191 F.3d 1033, 1042 (9th Cir. 1999); *Klussman v. Cross Country Bank*, 36 Cal. Rptr. 3d 728, 740-41 (Ct. App. 2005). Consequently, there is no "true conflict" between the interests of the states. *Kearney*, 137 P.3d at 922. Moreover, even if California's substantial interest did conflict in some degree with Michigan's minimal one, the California interest is considerably stronger and would clearly prevail. *See id.* The district court correctly determined that California law applies.

## II. Validity of the ADR Agreements

Defendants argue that the district court erred in ruling that both the non-binding conciliation and the binding arbitration provisions of the Quixtar ADR agreements are unconscionable and therefore unenforceable under California law. We

review de novo the district court's denial of a petition to compel arbitration, including its interpretation of the validity and scope of the underlying arbitration agreement. *Ticknor*, 265 F.3d at 936; *see also Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003) (district court's conclusion that an agreement is unconscionable raises a question of law subject to de novo review).

**[4]** Under California law, an arbitration agreement, like any other contractual clause, is unenforceable if it is both procedurally and substantively unconscionable. *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1072 (9th Cir. 2007). California courts apply a "sliding scale" analysis in making this determination: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000)). Thus, although both procedural and substantive unconscionability must be present for the contract to be declared unenforceable, they need not be present to the same degree. *Harper v. Ultimo*, 7 Cal. Rptr. 3d 418, 422 (Ct. App. 2003). Here, both are present to a high degree.

### A.   Procedural Unconscionability

**[5]** In assessing procedural unconscionability, the court, under California law, focuses on the factors of surprise and oppression in the contracting process, including whether the contract was one drafted by the stronger party and whether the weaker party had an opportunity to negotiate. *See Davis*, 485 F.3d at 1073. An agreement or any portion thereof is procedurally unconscionable if "the weaker party is presented the clause and told to 'take it or leave it' without the opportunity for meaningful negotiation." *Szetela v. Discover Bank*, 118 Cal. Rptr. 2d 862, 867 (Ct. App. 2002). Thus, we have said that a contract is procedurally unconscionable under California law if it is "a standardized contract, drafted by the party

of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Ting*, 319 F.3d at 1148.

**[6]** We agree with the district court that the Quixtar ADR agreements are procedurally unconscionable. Defendants do not dispute that Quixtar, a large corporation doing business throughout the United States, occupied a superior bargaining position to that of Plaintiffs. Defendants also do not dispute that Plaintiffs did not individually participate in the negotiation of the terms of the ADR agreements, or that the agreements were presented to Plaintiffs on a take-it-or-leave-it basis. This oppressive behavior is the quintessential characteristic of a procedurally unconscionable agreement. *See Szetela*, 118 Cal. Rptr. 2d at 867. Moreover, Quixtar failed to attach a copy of the Rules of Conduct, containing the full description of the non-binding conciliation and binding arbitration processes, to the registration forms containing the Agreement to Arbitrate, or to the BSMAA. In addition, those rules were subject to unilateral amendment by Quixtar at any time. Thus, Plaintiffs were not even given a fair opportunity to review the full nature and extent of the non-binding conciliation and binding arbitration processes to which they would be bound before they signed the registration agreements or the BSMAA. These problems multiply the degree of procedural unconscionability of the ADR agreements. *See Harper*, 7 Cal. Rptr. 3d at 422-23 (concluding that an arbitration agreement which merely incorporated by reference the applicable arbitration rules, which were subject to change, was procedurally unconscionable).

Defendants, however, assert that the Quixtar ADR agreements are not procedurally unconscionable for three reasons: (1) Quixtar negotiated the terms of its ADR process with the IBOAI, although not with the junior IBOs; (2) the Agreement to Arbitrate appeared in plain text on the front page of the registration agreements signed by Plaintiffs, although the Rules of Conduct did not; and (3) Plaintiffs could have refused to

become Quixtar distributors. None of these arguments save the ADR agreements.

First, although the IBOAI may have negotiated the terms of the ADR process with Quixtar, there is no evidence that Plaintiffs' interests were represented by the IBOAI during those negotiations. Plaintiffs, as junior IBOs, never joined the IBOAI. Even if they had, they never achieved the level of Platinum business required to vote for the members of the IBOAI Board. It was the members of that Board that voted to accept the ADR process. Indeed, Plaintiffs' lawsuit challenges not only the activities of Quixtar, but also the activities of senior IBOs who are among the Platinum members that control the IBOAI and elect its Board members. The interests of the IBOAI never corresponded with Plaintiffs' interests.

The fact that Plaintiffs signed or renewed registration forms containing the Agreement to Arbitrate does not assist Defendants. The forms incorporated by reference the Rules of Conduct over which Plaintiffs had no say. Plaintiffs signatures thus served to make each a party to a contract they now challenge as unconscionable. As the district court noted, the Plaintiffs must have signed on to the Agreement because "otherwise, no party to a contract would ever be able to argue unconscionability."

**[7]** It similarly does not help Defendants to argue that Plaintiffs could have gone into another line of work. The availability of alternative business opportunities does not preclude a finding of procedural unconscionability under California law. *See Davis*, 485 F.3d at 1074-75; *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1283 (9th Cir. 2006); *Szetela*, 118 Cal. Rptr. 2d at 867. The district court therefore properly rejected Quixtar's arguments and correctly determined that the Quixtar ADR agreements are procedurally unconscionable.

## B. Substantive Unconscionability

**[8]** "Substantive unconscionability addresses the fairness of the term in dispute." *Szetela*, 118 Cal. Rptr. 2d at 867. The focus of the inquiry is whether the term is one-sided and will have an overly harsh effect on the disadvantaged party. *Harper*, 7 Cal. Rptr. 3d at 423. Thus, mutuality is the "paramount" consideration when assessing substantive unconscionability. *Abramson v. Juniper Networks, Inc.*, 9 Cal. Rptr. 3d 422, 436 (Ct. App. 2004). "Agreements to arbitrate must contain at least 'a modicum of bilaterality' to avoid unconscionability." *Id.* at 437 (quoting *Armendariz*, 6 P.3d at 693) (some internal quotations omitted).

### 1. Non-Binding Conciliation

The district court held that the "requirement that an IBO engage in Informal and Formal Conciliation prior to arbitration is substantively unconscionable, and exceedingly so." It cited to the lack of mutuality of the requirement, the shortened statute of limitations created by the Rules of Conduct, Quixtar's unilateral and unchecked right to reverse or modify the IBOAI Hearing Panel's or Board's recommendation, and the inability of an IBO to effectively challenge the Rules of Conduct through the conciliation process, before concluding that "[t]he ADR deck could not possibly be stacked more in Quixtar's favor than it is here."

We agree with the district court and hold that the non-binding conciliation portion of the Quixtar ADR agreements is substantively unconscionable under California law. The California Court of Appeal addressed the validity of a similar ADR agreement in *Nyulassy v. Lockheed Martin Corp.*, 16 Cal. Rptr. 3d 296 (Ct. App. 2004). In that case, the plaintiff-employee signed an agreement under which he was required to resolve any employment dispute with the defendant-employer by first engaging in discussions with various levels of management, and then submitting any remaining claims to

binding arbitration within 180 days of either the date the dispute first arose or the date he was terminated. *Id.* at 299-300 & n.4. The court identified three aspects of this ADR agreement that it concluded rendered it substantively unconscionable. *Id.* at 307-08. First, the agreement lacked mutuality because only the plaintiff was required to resolve his claims through the ADR process, and no similar requirement bound the defendant. *Id.* at 307. Second, by "requiring [the] plaintiff to submit to an employer-controlled dispute resolution mechanism (i.e., one without a neutral mediator)," the defendant "would receive a 'free peek' at [the] plaintiff's case, thereby obtaining an advantage if and when [the] plaintiff were to later demand arbitration." *Id.* And third, the ADR agreement placed stringent time limitations on the plaintiff's assertion of any claims against the defendant without placing any similar limitations on the defendant's right to bring claims against the plaintiff. *Id.* at 307-08.

**[9]** The non-binding conciliation provisions of the Quixtar ADR agreements suffer from similar deficiencies. Although the Quixtar ADR agreements require an IBO to submit any claim it has against Quixtar to Informal and Formal Conciliation, they impose no similar obligation on Quixtar when it has a claim against one of its IBOs. Defendants contend that the obligation is bilateral, citing to a portion of the Rules of Conduct that first sets forth a narrow exception to the rule requiring IBOs to use the non-binding conciliation process, and then states: "In all other cases the parties will try to resolve the dispute as provided for under these Rules." A fair reading of the Rules of Conduct as a whole does not support Defendants' position. All of the obligations and procedures relating to the non-binding conciliation process refer directly to IBOs, not Quixtar. That is because the stated purpose of the Rules of Conduct is to "define and establish (1) certain principles to be followed in the development and maintenance of an Independent Business . . . ; and (2) the rights, duties, and responsibilities of each [IBO]." Conspicuously absent from this purpose is the creation of any duties or responsibilities for Quixtar. To

the contrary, in the Rules of Conduct Quixtar reserved to itself "the sole right to adopt, amend, modify, supplement, or rescind any or all of these Rules, as necessary with respect to cases of Rules enforcement."

**[10]** It was for this very reason that the Fifth Circuit held that a similar ADR scheme in a prior version of the Rules of Conduct promulgated by Quixtar's predecessor Amway was illusory and unenforceable under Texas law. *See Morrison v. Amway Corp.*, 517 F.3d 248, 254-57 (5th Cir. 2008). Thus, it is clear that, unlike its IBOs, Quixtar is not bound to follow the ADR process outlined in the Rules of Conduct. The district court therefore properly concluded that the obligation to engage in non-binding conciliation is not mutual.

**[11]** As was the case in *Nyulassy*, the unilateral requirement that an IBO submit its claims against Quixtar to Informal and Formal Conciliation before proceeding to arbitration unfairly hampers IBOs by subjecting them to "an employer-controlled dispute resolution mechanism" that provides Quixtar with a "free peek" at the IBO's case against it. 16 Cal. Rptr. 3d at 307. That the non-binding conciliation process is employer-controlled cannot be fairly disputed. The Informal Conciliation is conducted by Quixtar's own Business Conduct and Rules Department. During Formal Conciliation, Quixtar has the unilateral right to issue a final decision accepting, rejecting, or modifying the recommendation it receives from either the IBOAI Hearing Panel or the IBOAI Board. Thus, the non-binding conciliation process amounts to little more than an exploratory evidentiary hearing for Quixtar. It will ultimately make the final decision on the matter regardless of what the IBOAI Hearing Panel or Board may recommend. This procedure clearly gives Quixtar an unfair advantage if and when the IBO decides to demand arbitration. *Id.*

**[12]** Finally, as in *Nyulassy*, the ADR agreements in this case place time restrictions on an IBO's right to bring a claim against Quixtar, but do not place similar limitations on Quix-

tar's right to bring a claim against an IBO. *Id.* at 307-08. As the district court explained, the Rules of Conduct "cut[ ] the window for seeking relief at both ends. At the front end, the IBO cannot initiate an arbitration against Quixtar until at least 90 days after the claim arises, because it must go through Conciliation first. At the back end, the IBO only has two years to initiate the arbitration (or less if the applicable statute of limitations is shorter)." Thus, while Quixtar may seek immediate binding relief on any claim it has against an IBO, that same IBO must wait at least 90 days before it can seek binding relief on a claim it has against Quixtar. Further complicating matters, by reserving to itself final say on the recommendations made by the IBOAI Hearing Panel and Board during Formal Conciliation, Quixtar can drag out the non-binding conciliation process much longer than 90 days, as the Rules of Conduct impose no timetable on Quixtar for making its decision. An IBO, meanwhile, has no similar ability to delay Quixtar from seeking binding relief on any claim Quixtar asserts against it.

In addition, the non-binding conciliation provisions of the Quixtar ADR agreements provide no meaningful opportunity for an IBO to challenge the Rules of Conduct. As the district court concluded, the Rules of Conduct are "self-perpetuating" and therefore "inherently biased" against an IBO that seeks to challenge them. The Rules of Conduct explicitly state that both the IBOAI Hearing Panel and Board are "bound by the Rules of Conduct" during conciliation; that they "may not modify, alter, amend, or ignore the current positions of the Rules of Conduct"; and that any recommendation they make to Quixtar "should promote and further the goal of compliance" and "must be consistent with the Rules of Conduct." No similar limitations are placed on Quixtar's resolution of a claim once it receives a recommendation from the Hearing Panel or Board. To the contrary, the Rules of Conduct specifically state that "Quixtar reserves to itself the sole right to adopt, amend, modify, supplement, or rescind any or all of these Rules, as necessary with respect to cases of Rules

enforcement." Thus, while Quixtar may change any Rule of Conduct with which it does not agree during the non-binding conciliation process, its IBOs do not even have a vehicle for ever challenging those Rules. This lopsided advantage enjoyed by Quixtar is precisely the type of one-sidedness that the doctrine of substantive unconscionability is designed to protect against. *See Harper*, 7 Cal. Rptr. 3d at 423.

Defendants attempt to salvage the Informal and Formal Conciliation requirements in the Quixtar ADR agreements by arguing that under *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205 (9th Cir. 1998), the non-binding conciliation process is an enforceable condition precedent to binding arbitration. We agree with the district court that Quixtar's reliance on *Wolsey* is misplaced. Although we ultimately reversed the district court's denial of a motion to compel arbitration in that case, we decided only that non-binding arbitration qualifies as an "arbitration" within the meaning of the FAA, and that the parties' agreement incorporated California's arbitration rules through its choice-of-law clause. *Id.* at 1207-13.

**[13]** As the district court explained, Plaintiffs in this case are not challenging the general proposition that when parties enter into a valid and enforceable agreement to engage in a non-binding dispute resolution process before submitting their claims to binding arbitration or litigation, courts should require compliance with that agreement. Instead, Plaintiffs contend that the unfair and one-sided limitations in this non-binding conciliation process render it unconscionable and therefore unenforceable.

### 2. Binding Arbitration

The district court also held that the binding arbitration portion of the Quixtar ADR agreements is substantively unconscionable. In support of this conclusion, the court cited to the lack of mutuality in the requirement that IBOs engage in binding arbitration, the reduced statute of limitations imposed by

the Rules of Conduct, the unilateral confidentiality require-
ment imposed on IBOs, the inclusion of an arbitration selec-
tion process that unfairly favors Quixtar, and the inclusion of
a fee-shifting provision that requires the losing party to bear
the costs of the arbitration, including the prevailing party's
attorneys' fees. Defendants dispute the district court's deter-
minations as to each of these points. We agree with the dis-
trict court and hold that the binding arbitration portion of the
Quixtar ADR agreements is substantively unconscionable
because it lacks even "a modicum of bilaterality." *Abramson*,
9 Cal. Rptr. 3d at 437.

   **[14]** Like the requirement to engage in non-binding concil-
iation, the requirement to engage in binding arbitration is not
mutual. Under the Rules of Conduct, an IBO must submit any
claim it has against Quixtar or another IBO that is not satis-
factorily resolved through the non-binding conciliation pro-
cess to binding arbitration if it wishes to pursue the claim
further. The Rules of Conduct contain no provision requiring
Quixtar to initiate any claim it has against an IBO using the
Quixtar ADR process. Thus, as the district court pointed out,
although Quixtar may be forced into binding arbitration when
an IBO initiates the dispute, Quixtar is free to initiate and liti-
gate any claim it has against an IBO in court without ever
submitting the claim to binding arbitration. Requiring one
party to arbitrate its claims but not the other is a paradigmatic
form of substantive unconscionability under California law.
*See Little v. Auto Stiegler, Inc.*, 63 P.3d 979, 984 (Cal. 2003);
*Armendariz*, 6 P.3d at 693.

   Also lacking in mutuality is the requirement that an IBO
make a demand for arbitration "within two years after the
issue has arisen, but in no event after the date when the initia-
tion of legal proceedings would have been barred by the
applicable statute of limitations." This provision in the Rules
of Conduct creates a disparity between IBOs and Quixtar
because it reduces the potentially longer statute of limitations
for any claim an IBO may wish to bring against Quixtar or

another IBO to two years, whereas, if there is a longer statute of limitations, Quixtar may initiate a claim against an IBO in court after the expiration of two years. This is because it is not required to arbitrate its claims.

**[15]** Defendants attempt to defend the reduced limitations period by arguing that a contracted-for limitations period is enforceable under California law so long as it is both reasonable and mutual. *See Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1043-44 (9th Cir. 2001). The problem with the contractual reduction in the limitations period in this case, of course, is that it is not mutual. *Soltani* recognized that lack of mutuality is relevant to assessing substantive unconscionability, 258 F.3d at 1043, and relied on *West v. Henderson*, 278 Cal. Rptr. 570, 575-76 (Ct. App. 1991), which held that lack of mutuality makes contractual provisions "suspect" and upheld a non-mutual provision only after finding that it was supported by a specific justification. Particularly in situations like this one, where no special circumstance necessitates a non-mutual provision, a unilateral reduction in the statute of limitations is an indicator of substantive unconscionability. *See Nyulassy*, 16 Cal. Rptr. 3d at 307-08.

**[16]** Another indicator of substantive unconscionability is the confidentiality requirement in the Rules of Conduct. This prohibits IBOs engaged in the arbitration process from disclosing "to any other person not directly involved in the conciliation or arbitration process (a) the substance of, or basis for, the claim; (b) the content of any testimony or other evidence presented at an arbitration hearing or obtained through discovery; or (c) the terms [or] amount of any arbitration award." This confidentiality requirement takes effect the moment an IBO "becomes aware of a potential Rule violation or of a claim against another IBO or [Quixtar]." Thus, once an IBO is aware that it has a potential claim against Quixtar, it is forever barred from disclosing to anyone not involved in the resolution of that claim the basis for it, the evidence supporting it, or the outcome of the arbitration. Quixtar, on the

other hand, is not similarly prohibited from making such disclosures up until the time an IBO formally demands arbitration. Additionally, Quixtar can avoid the confidentiality requirement altogether when it brings its own claims against an IBO because it is not required to first assert those claims using the Quixtar ADR process.

**[17]** In *Davis*, we held that a similar confidentiality clause in an employer's dispute resolution program was substantively unconscionable, even though in that case the confidentiality requirement applied equally to the employer and any aggrieved employee. 485 F.3d at 1071, 1078-79. There, the confidentiality clause prohibited the parties from divulging "to any third party or person not directly involved in the mediation or arbitration the content of the pleadings, papers, orders, hearings, trials, or awards in the arbitration." *Id.* at 1071. We said that the "confidentiality clause as written unconscionably favors" the employer because the restrictions it imposed "would prevent an employee from contacting other employees to assist in litigating (or arbitrating) an employee's case." *Id.* at 1078. This "inability to mention even the existence of a claim" to other current or former employees "would handicap if not stifle an employee's ability to investigate and engage in discovery," could possibly "prevent others from building cases," and would place the employer " 'in a far superior legal posture' by preventing [employees] from accessing precedent while allowing [the employer] to learn how to negotiate and litigate its contracts in the future." *Id.* (quoting *Ting*, 319 F.3d at 1152). Because the confidentiality clause swept so broadly, we concluded that it was substantively unconscionable. *Id.* at 1078, 1084.

In our earlier opinion in *Ting*, the defendant telephone company had an agreement with its customers requiring disputes to be resolved through arbitration. 319 F.3d at 1133 & n.4. The agreement contained a confidentiality provision that stated: "Any arbitration shall remain confidential. Neither [the customer] nor [the company] may disclose the existence, con-

tent or results of any arbitration or award, except as may be required by law or to confirm and enforce an award." *Id.* at 1151 n.16. We recognized that although this provision was "facially neutral," it favored the defendant company because the company would be a repeat player in the arbitration process, continually arbitrating the same claims and accumulating "a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract." *Id.* at 1151-52. The defendant's customers, meanwhile, would be unable to access precedent and might be unable to obtain the information needed to build a case of intentional misconduct or unlawful discrimination against the defendant. *Id.* at 1152. For these reasons, we held the confidentiality provision was unconscionable.

The confidentiality provision in this case, like the confidentiality provisions at issue in *Davis* and *Ting*, unfairly favors Quixtar because it prevents Plaintiffs from discussing their claims with other potential plaintiffs and from discovering relevant precedent to support their claims. The unfair advantage enjoyed by Quixtar is especially acute because the Rules of Conduct state that discovery is only available to the extent the arbitrator "considers necessary to the full and fair exploration of the issues in dispute." Thus, while handicapping the Plaintiffs' ability to investigate their claims and engage in meaningful discovery, the confidentiality provision does nothing to prevent Quixtar from using its continuous involvement in the Quixtar ADR process to accumulate "a wealth of knowledge" on how to arbitrate future claims brought by IBOs. *Ting*, 319 F.3d at 1152. The district court therefore properly concluded that the confidentiality clause in the Rules of Conduct is substantively unconscionable.

**[18]** Also contributing to the total substantive unconscionability of the binding arbitration provisions is the arbitration selection procedure mandated by the Rules of Conduct. Under this procedure, once an IBO initiates an arbitration proceeding, the case administrator mails each party an "Arbitra-

tion Selection Letter" containing the names of at least five arbitrators associated with JAMS who have attended an "orientation" conducted by Quixtar, and encouraging the IBO to select one of these arbitrators. The IBO then has fourteen days from the date of the Arbitration Selection Letter to object to the use of a Quixtar-trained JAMS arbitrator, in which case a new list of JAMS arbitrators not trained by Quixtar is sent to the parties. If the IBO opts to use a Quixtar-trained JAMS arbitrator, the parties are billed at the arbitrator's published hourly rate, but the daily fee cannot exceed a fixed amount. If, however, the IBO opts instead to use a non-Quixtar-trained JAMS arbitrator, the parties are billed at the arbitrator's published hourly rate without the daily fee cap.

In another federal case involving Quixtar and its predecessor Amway, the United States District Court for the Western District of Missouri held that a prior version of the Rules of Conduct requiring the use of an Amway-trained JAMS arbitrator was substantively unconscionable under Michigan law. *Nitro Distrib., Inc. v. Alticor, Inc.*, No. 03-3290-CV-W-RED, 2005 U.S. Dist. LEXIS 46777, at *38-43 (W.D. Mo. Sept. 16, 2005), *aff'd on other grounds*, 453 F.3d 995 (8th Cir. 2006). The court described in detail the orientation that Amway used to train its arbitrators:

> [The] "training" covered a two day period and then a third day of "interviews." The training covered subjects including profiles of the people who started and now run Amway, the benevolent and independent culture of Amway, procedures to the [sic] utilized in arbitration, and a summary of various complaints the arbitrators could anticipate. The arbitrator candidates even participated in some "role playing" as successful Amway distributors. Also included throughout the two days were assurances that Amway was not a pyramid scheme and that the business was legitimate.

*Id.* at *38-39. The court concluded that "the training atmosphere and content of the discussions was designed to produce a very favorable view of [Quixtar and Amway]," and that the orientation included "subtle manipulation on issues which could be expected to be considered by the arbitrators." *Id.* at *39-40.

The district court in this case observed that Quixtar "still trains possible arbitrators with the same process, and still maintains a 'Roster of Neutrals' who have participated in the training" described by the court in *Nitro*. Defendants do not dispute this. In fact, it is from the JAMS arbitrators listed on the Roster of Neutrals that the case administrator must select at least five names to include as recommended arbitrators in the Arbitration Selection Letter. We therefore agree with the district court that these letters, sent to the parties at the outset of the arbitration selection process, "unfairly benefit[ ] Quixtar" by "encourag[ing] the use of a decidedly unfair process, without describing any possible disadvantages of using [Quixtar-]trained [arbitrators]." It does not matter that the letters disclosed to IBOs that the recommended arbitrators had attended an orientation conducted by Quixtar, or that the letters provided the names of the principal speakers at the orientation each arbitrator attended. The use of Quixtar-trained arbitrators is to Quixtar's advantage, and the IBOs who receive the letters are not informed of that pertinent fact.

Defendants contend, however, that the arbitration selection process is not unconscionable because, unlike the version of the Rules of Conduct at issue in *Nitro*, the current Rules allow an IBO to opt out of using a Quixtar-trained JAMS arbitrator and instead select a non-Quixtar-trained JAMS arbitrator or an arbitrator from the American Arbitration Association ("AAA"). This is not a realistic alternative. As the district court noted, the use of an AAA or any other non-JAMS arbitrator "is not actually a route available to an IBO dissatisfied with the JAMS options" because a non-JAMS arbitrator may only be used if JAMS is "unable or unwilling to perform its

responsibilities" as case administrator. And the option of using a non-Quixtar-trained JAMS arbitrator presents IBOs with the unpalatable choice of selecting a possibly biased arbitrator whose daily fees are capped, or selecting a neutral arbitrator with no daily fee cap. As the district court succinctly stated, an IBO "should not have to pay extra" to avoid the unfairness created by Quixtar's orientation program. The district court therefore properly determined that the arbitration selection process is substantively unconscionable.

**[19]** Finally, the Rules of Conduct include a fee-shifting clause that unfairly exposes IBOs to a greater financial risk in arbitrating claims than they would face if they were to litigate those same claims in federal court. This clause states that "[t]he Arbitrator shall, in the award, assess arbitration fees, costs, expenses, reasonable attorneys' fees, and compensation as provided in the applicable Fees/Costs Schedule, in favor of the prevailing party and, in the event any fees or costs are due the [case administrator], in favor of the Administrator."

The district court characterized this clause as a "loser pays" provision that unfairly favors Quixtar. The court explained that "[a]n IBO who initiates an arbitration against Quixtar under the [Rules of Conduct] and does not prevail will potentially be responsible not only for the full cost of the arbitration itself, but also for Quixtar's reasonable attorney's fees." The court went on to point out that "litigation in federal court provides for a successful RICO plaintiff to recover attorney's fees, but does not expose such a plaintiff to the risk of having to pay the defendant's fees if the suit is unsuccessful." *See* 18 U.S.C. § 1964(c). We agree that because the fee-shifting clause puts IBOs who demand arbitration at risk of incurring greater costs than they would bear if they were to litigate their claims in federal court, the district court properly held that the clause is substantively unconscionable. *See Ting*, 319 F.3d at 1151 (fee-splitting scheme in defendant's service agreement with its customers unconscionable "because it imposes on some consumers costs greater than those a complainant would

bear if he or she would file the same complaint in court"); *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 894 (9th Cir. 2002) (dispute resolution agreement that required an aggrieved employee who brought a claim against her employer to split the arbitrator's fee with the employer rendered the entire arbitration agreement unenforceable); *Armendariz*, 6 P.3d at 687 ("[W]hen an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any *type* of expense that the employee would not be required to bear if he or she were free to bring the action in court.").

Defendants contend that under United States Supreme Court precedent, Plaintiffs have the burden of establishing that arbitration of their claims in accordance with the Quixtar ADR process will expose them to actual financial hardship, rather than the mere risk of such hardship, and that Plaintiffs have failed to carry this burden. *See Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90-92 (2000). The issue in *Green Tree*, however, was whether an arbitration agreement that did not mention fees and costs was unenforceable because it failed to "affirmatively protect a party from potentially steep arbitration costs." *Id.* at 82. Here we have an arbitration agreement that actually includes a fee-shifting provision and that places those costs on the IBO if it loses in a process already stacked against it.

**[20]** The district court therefore properly determined that the binding arbitration portion of the Quixtar ADR agreements, like the non-binding conciliation portion, is unenforceable because it is both substantively and procedurally unconscionable.

## C.  Severability

**[21]** Under California law, a court has discretion to either sever an unconscionable provision from an agreement, or

refuse to enforce the agreement in its entirety. *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1180 (9th Cir. 2003). "In exercising this discretion, courts look to whether the 'central purpose of the contract is tainted with illegality' or 'the illegality is collateral to [its] main purpose.' " *Id.* (quoting *Adams*, 279 F.3d at 895). Defendants argue that the district court should have severed any unconscionable clauses in the Quixtar ADR agreements and enforced the remaining provisions rather than refusing to enforce the Quixtar ADR process as a whole.

**[22]** We agree with the district court that the Quixtar ADR agreements are "simply too tainted to be saved through minor adjustments," and hold that the entire ADR process mandated by those agreements is unconscionable and therefore unenforceable. The unconscionable portions of the Quixtar ADR agreements include the unilateral requirement that IBOs submit their claims to Informal and Formal Conciliation, the prohibition against modification of the Rules of Conduct by the IBOAI Hearing Panel or Board during Formal Conciliation, the right of Quixtar to reverse or modify the recommendations of the IBOAI Hearing Panel and Board at the conclusion of Formal Conciliation, the statute of limitations for submitting a claim to binding arbitration, the unilateral requirement that IBOs submit their claims to binding arbitration, the confidentiality requirement, the arbitration selection process, and the fee-shifting clause. As the district court noted, severing the offending provisions of the Quixtar ADR agreements and enforcing what remains "would have virtually no effect" because the agreements are "permeated with unconscionable provisions." The district court therefore did not abuse its discretion when it refused to sever the unconscionable clauses from the Quixtar ADR agreements and enforce the remaining provisions. *See Armendariz*, 6 P.3d at 695.

## CONCLUSION

For the foregoing reasons, we hold the district court properly determined that the Quixtar ADR agreements are uncon-

scionable and therefore unenforceable under California law. We deny Plaintiffs' request for judicial notice as moot. We affirm the order of the district court denying Defendants' motion to dismiss or to compel arbitration.

**AFFIRMED.**