PREGERSON, Circuit Judge,
dissenting:
I. Hustled by the school; hustled by the bank.
Silver State Helicopter School did not do a good job training helicopter pilots, placing them in jobs, or managing its own finances. But it did make a convincing sales pitch. Silver State promised its students that they would get the training required to get good paying jobs as commercial helicopter pilots.
At flashy career fairs around California, Silver State worked hard to sign up prospective students for its helicopter pilot training program. Former Silver State student, Mathew Kilgore, declared under penalty of perjury:
The seminar was very impressive and glitzy. There were numerous helicopters onsite and the school appeared to be very professional. [Silver State’s CEO, Jerry Airola] was very convincing and portrayed Silver State as a top flight school. The presentation made clear that Silver State was very selective about which students would be chosen to attend the school ... Mr. Airola emphasized that all of the tuition to fund the entire Silver State education could be obtained through Silver State’s partner lender, KeyBank. Mr. Airola also emphasized that ... the loans would only cost the students about [a] hundred dollars a week at 4% interest.
Airola’s claims were not true. Silver State accepted almost all applicants who could get their loans approved. Silver State lacked sufficient equipment or instructors to properly train its students. The variable rate interest on the loans would rise far above four percent.[1] Matthew Kilgore, *1062 William Fuller, and the other 120 putative class members believed what Airola told them and signed up. They took out $55,950 loans, which KeyBank promptly forked over to Silver State before students took a single class.
But Silver State knew it was headed for a crash landing. By 2008, Silver State had racked up ten million dollars in debt against fifty thousand dollars in assets. Moreover, despite Silver State’s alluring promises, there was no significant demand for helicopter pilots with a Silver State degree. And it wasn’t just the school that knew it. Defendant KeyBank knew it, too.
KeyBank, an Ohio-based lending giant, participated in the fraud that Silver State perpetrated on unwitting students. From 2003 to 2005 KeyBank financed ninety-five percent of the tuition students paid to Silver State. KeyBank printed up lengthy loan papers that lacked the Federal Trade Commission’s Holder Rule Notice. 16 C.F.R. § 433.2 The Holder Rule required the loan contracts to notify students that KeyBank was subject to the same claims and defenses as Silver State. Id. The Holder Rule protects borrowers, such as the students, from being legally obligated to pay a creditor like KeyBank “despite breach of warranty, misrepresentation, or even fraud on the part of the seller.” 40 Fed.Reg. 53,506, 53,507 (Nov. 18, 1975). By omitting that notice from its printed loan contracts, KeyBank may have sought to insulate itself from liability for Silver State’s misleading promises. Silver State then presented those faulty loan contracts to prospective students and “pressure[d] the students to sign the [master promissory notes] as soon as possible,” according to an affidavit of Silver State’s former student finance manager Jody Pidruzny. And sign up they did.
Once a student signed the promissory note, KeyBank immediately transferred the full amount of the loans to Silver State. KeyBank then turned a profit by selling the students’ loans on the securities market to investors. Defendant Great Lakes Educational Loan Services, Inc. continues to service those loans by collecting payments from students, and notifying credit reporting agencies when students fail to pay.
KeyBank loaned students tuition money to attend Silver State knowing that Silver State was financially volatile. A 2004 email between KeyBank Vice Presidents Paul McDermott and Rodney Landrum predicted that Silver State “could be the next ‘big one’ to go under.” Nevertheless, KeyBank made more than ten million dollars in loans to Silver State students over the following two years. In 2008, Silver State filed for bankruptcy and closed its doors. Students could not recoup the amount of their unused tuition because Silver State sought protection under Chapter 7 bankruptcy proceedings.
Kilgore, Fuller, and their classmates were left holding the bag with no degree, no helicopter piloting career, and no opportunity to train. The students’ failed attempts to launch flight careers saddled them with huge private loans that are collecting interest and weighing them down.
The private loans students incurred to pay for Silver State helicopter pilot training were not subsidized or insured by the federal government. Private student loans are generally more expensive than federal loans, especially for students with lower credit scores or limited credit histories. Students could borrow larger amounts because there are no loan limits for private loans. Moreover, students who hold private loans are not eligible for federal programs that allow them to reduce their monthly payments based on their income, or have their loans forgiven after working for ten years in public service jobs.[2]
*1063 Unlike federally guaranteed loans, private student loans are not discharged should the school go out of business. The students themselves cannot discharge these loans in bankruptcy proceedings unless they can prove that “excepting such [student] debt from discharge ... would impose an undue hardship.” 11 U.S.C. § 523(a)(8).
II. Ignored by the courts.
To make matters worse, the majority opinion strips Kilgore, Fuller, and their classmates of the ability to find recourse in state or federal court. The majority holds that we must compel arbitration in the students’ case, a holding at odds with the district court’s decision. According to the majority, the arbitration clause was not unconscionable. I disagree.
A contract provision is unenforceable under California law if it is both procedurally and substantively unconscionable. See Pokorny v. Quixtar, Inc., 601 F.3d 987, 996 (9th Cir.2010). California applies a sliding scale to determine if a contract is unenforceable due to unconscionability. Armendariz v. Found. Health Psychcare Servs., 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (2000). The more substantively unconscionable the contract, the less procedurally unconscionable it must be to be found unconscionable, and vice versa. Id. Here, the arbitration clause is highly procedurally and substantively unconscionable.
A. Procedurally Unconscionable
If both parties agree to give up the protections of the courts, arbitration can be a just and efficient way to resolve disputes. But Kilgore, Fuller, and their classmates signed contracts under unconscionable “take it or leave it” conditions. Pokorny v. Quixtar, Inc., 601 F.3d 987, 996 (9th Cir.2010). This means that they did not agree to arbitration. Without such an agreement, it is wholly inappropriate to stop them from having their claims decided by a court.
Under California law: “A contract is procedurally unconscionable if it is a contract of adhesion, i.e., a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it.” Ting v. AT&T, 319 F.3d 1126, 1148 (9th Cir.2003). Procedural unconscionability focuses on the “the factors of surprise and oppression in the contracting process.” Pokorny, 601 F.3d at 996.
There can be no doubt that the promissory notes were contracts of adhesion, and that surprise and oppression dominated the contracting process. I have attached as an Appendix the dense, small print, and blurry nine-page contract that Silver State thrust on the students at career fairs and open houses. The arbitration clause at issue was buried in the middle of the contract, split over two pages, and surrounded by language that was difficult to read and understand. See Appendix at 3-4; see also Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1171 (2003) (“Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms.” (internal quotations and citations omitted)). KeyBank officials never discussed the loans with students or mentioned the arbitration clause to them. KeyBank left those jobs to Silver State’s financial aid staff — employees who, according to the record, did not know that the *1064 loans contained arbitration clauses. Silver State staff pressured students to sign the loans immediately or else risk losing their spots in the school. Pidruzny, the school’s Student Finance Manager, explained the strategy in her sworn declaration:
At the direction of my superiors I conveyed KeyBank’s and Silver State’s directives to expedite the loan application process and pressure the students to sign the [Master Promissory Notes] as soon as possible ... I did not discuss the terms of the [Master Promissory Notes] with Silver State students. Specifically, I did not discuss the Arbitration Provision with any Silver State Student. ...
In light of these facts, it is unsurprising that students felt pressured to sign the contract without knowing it contained an arbitration clause. Moreover, the sixty day opt-out provision was meaningless because students did not know the arbitration clause existed in the first place. As Kilgore declared, “I did not know that the Promissory Note contained an arbitration provision (nor did I know that I could opt out of the arbitration provision) ... I believed that the Promissory Note had to be signed immediately and I felt pressured to do so. I believed that if I did not sign the Promissory Note I would lose my spot at Silver State.” Surprise? Yes. Oppression? Yes. Procedural unconscionability? Definitely.
B. Substantively Unconscionable
A contract provision is substantively unconscionable if it is “one-sided and will have an overly harsh effect on the disadvantaged party. Thus, mutuality is the paramount consideration when assessing substantive unconscionability.” Pokorny, 601 F.3d at 997 (internal quotations and citations omitted). To make that determination, courts must “look beyond facial neutrality and examine the actual effects of the challenged provision.” Ting, 319 F.3d at 1149. KeyBank’s contract fails the mutuality test in three respects:
1. The confidentiality provision requires both parties to maintain the confidentiality of any claim they arbitrate. While facially neutral, this claim overwhelmingly favors KeyBank. A student who wins in arbitration against KeyBank cannot alert other students or arbitrators to KeyBank’s predatory practices that led to the win. But KeyBank is a repeat player in these arbitrations; it knows the outcome of each arbitration and can use that knowledge to its advantage. Id. at 1152 (Defendant “has placed itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, defendant accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract.”).
2. The high cost of arbitration imposes another unequal burden, creating further substantive unconscionability. Filing a civil case in California Superior Court costs less than five hundred dollars. Filing the same claim before an arbitrator, runs more than four thousand dollars. The high cost of arbitration will prevent many students from vindicating their rights, but will not limit KeyBank’s ability to defend itself. This asymmetry makes arbitration all the more unconscionable. See Ting, 319 F.3d at 1151 (finding a fee-splitting arbitration clause unconscionable “because it imposes on some consumers costs greater than those a complainant would bear if he or she would file the same complaint in court.”).
3. The arbitration process itself greatly favors banks over consumers. One study found that the National Arbitration Forum, one of the two arbitrators named in the contract, ruled for banks and credit card companies, and against consumers *1065 ninety-four percent of the time.[3] This further gives KeyBank an unfair advantage in resolving any claims.
KeyBank foisted loans on students who staked their financial well-being on the shaky promises of Silver State Helicopter school. When Silver State went down, so did the students. The students deserve, and I submit the law requires, that then-claims be heard and adjudicated by a court. The provision in the promissory note relegating students to arbitration is unconscionable and thus unenforceable. Therefore, I dissent.

. See Appendix at 9.

. See Editorial, Student Debt and the Economy, N.Y. Times, March 10, 2013, at SR 10 *1063 ("Because private loans offer little flexibility, borrowers in bad straits have few options except default, which makes it difficult for them to get jobs or credit, or even to rent apartments.”).

. Public Citizen, The Arbitration Trap: How Credit Card Companies Ensnare Consumers 2 (2007), available at http://www.citizen.org/ documents/ArbitrationTrap .pdf.