Doneyda PEREZ, Plaintiff,

v.

DIRECTV GROUP HOLDINGS, LLC;
Lonstein Law Offices, P.C.; and Julie
Cohen Lonstein, Defendants.

CASE NO. 8:16–cv–1440–JLS–DFMx

United States District Court,
C.D. California.

Signed 05/01/2017

Plaintiff Kevin Mahoney, Atoy Hari Wilson, Katherine J. Odenbreit, Mahoney Law Group APC, Long Beach, CA, for Plaintiff.

Archis A. Parasharami, Andrea M. Weiss, Mayer Brown LLP, Washington, DC, Mary K. Wyman, Connie M. Anderson, Lewis Brisbois Bisgaard and Smith LLP, San Diego, CA, for Defendants.

## ORDER DENYING DEFENDANTS' MOTIONS TO COMPEL ARBITRATION (Docs. 18, 20)

JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

Plaintiff Doneyda Perez brings this action alleging that DirecTV and the other Defendants engaged in a scheme to defraud small, minority-owned businesses by selling them commercial satellite cable television service, only to later claim that the businesses were not authorized to display DirecTV in a commercial establishment, and then threaten the business owners with litigation to extract a settlement payment. Defendants DirecTV Group Holdings, LLC, Lonstein Law Offices, P.C., and Julie Cohen Lonstein move to compel Perez to arbitrate her claims.

### II. BACKGROUND

The manner in which the transaction took place between DirecTV and Perez is significant in determining whether the parties entered into an agreement to arbitrate, and whether that agreement is valid; therefore, the Court describes below Perez's allegations as to the nature of the transaction, a description which, for the purposes of this motion, DirecTV does not materially contest.[1]

### A. DirecTV Solicits Perez's Business

Perez owns Oneida's Beauty and Barber Salon in Garden Grove, California. (Perez Decl. ¶ 2, Doc. 26–3.) On June 5, 2013, a DirecTV representative came to Perez's beauty salon to offer her a promotional deal that would provide her business with satellite cable television for $35.00 per month for two years. (Id. ¶¶ 3–4.) Perez's conversation with DirecTV's representative was entirely in Spanish. (Id. ¶ 6.) Although Perez had no prior interest in purchasing satellite cable television services from DirecTV, she agreed to the pro-

---

1. Had there been disputed factual accounts of the manner in which the transaction took place that affected the validity of the arbitration provision, the Court would have held an evidentiary hearing to resolve those factual disputes. Here, however, DirecTV did not dispute the nature of the transaction between Perez and the DirecTV representative, nor did Perez materially dispute the manner in which DirecTV followed up with various agreements over the course of time. Nor did either party request further discovery or an evidentiary hearing. At the hearing, when the Court raised the possibility of holding an evidentiary hearing, DirecTV's counsel expressed that it would be unnecessary. Therefore, the Court accepted the evidence proffered in the Declarations and attached exhibits, along with the parties' briefs and oral argument.

motional deal for her business based on the representative's representations regarding the terms of the deal, including access to Spanish-language channels. (*Id.* ¶ 4.) After Perez agreed to the promotional deal, the DirecTV representative installed the necessary equipment in her salon that very same day. (*Id.* ¶ 5.) During the installation, the DirecTV representative requested Perez's personal information, including her business bank account information. (*Id.* ¶ 6.) After the installation was complete, the representative asked Perez to sign a single document, the Equipment Lease Agreement ("ELA"), which was in English. (*Id.*; *see* Robson Decl., Ex. 5,

Doc. 18–12.) Pertinent to Perez's claims here, the ELA does not inform the customer that the service cannot be used in commercial establishments. (*See* Robson Decl., Ex. 5; *see also* Robson Decl., Ex. 4 at 1, Doc. 18–11.)

### B. The Equipment Lease Agreement

The ELA is typed in small print. It includes a paragraph titled "Programming Agreement and Term" and tells the consumer that if she cancels before the end of a two-year term, she will be charged an early cancellation fee of up to $480. (Robson Decl., Ex. 5.) Towards the bottom of the page, the ELA states as follows:

(*Id.* )

The ELA also states near the top of the page [2]:

(*Id.* ) Although the ELA states that Perez already received the DIRECTV Customer Agreement, DirecTV has acknowledged that Perez would not have been provided with either the Customer Agreement or an Order Confirmation at the time that her equipment was installed and she signed the ELA. (Robson Decl. ¶ 11, Doc. 18–7.) It was only after Perez agreed to purchase

DirecTV's services, and after DirecTV installed the necessary equipment and activated service, that DirecTV mailed her a copy of an English-language version of the Customer Agreement in effect at that time. (Robson Decl. ¶¶ 11–12; Robson Decl., Ex. 2, Doc. 18–9; Robson Decl., Ex. 3, Doc. 18–10.) This was in accordance with DirecTV's practice of sending Customer

---

**2.** The provision, although obscured by writing, reads "Thank you for choosing DIRECTV! This Equipment Lease Agreement (ELA) has important terms and conditions regarding your lease of equipment from DIRECTV. By 'equipment,' we mean the DIRECTV Receiver, Client(s), access card, and/or remote control (not the dish and/or

cabling). You received the DIRECTV Customer Agreement with your DIRECTV Order Confirmation. The Customer Agreement, together with this ELA, comprise the terms of your service agreement with DIRECTV. Please be sure to read and keep copies of both. They are also available at www.directv. com/legal." (*See* Robson Decl., Ex. 4 at 1.)

Agreements to new customers only after they order service. (Robson Decl. ¶¶ 4–5.)

Because Perez has difficulty reading and writing English, she could not understand the contents of the ELA. (Perez Decl. ¶ 6.) Although she had been speaking with the DirecTV representative in Spanish, the representative did not translate the ELA into Spanish for her. (Id.) Nor did the representative provide her with a Spanish-language version of the ELA, even though DirecTV has Spanish-language versions of the ELA available. (Id.; Robson Decl., Ex. 4 at 2.) Perez gave the signed ELA to the DirecTV representative but did not receive a copy of her own. (Perez Decl. ¶ 6.)

According to DirecTV, the ELA provided to Perez at the time she signed up for the service was simply an "addendum" to the Customer Agreement. (Robson Decl. ¶ 8.)

## C. DirecTV's Later Communications
### 1. The Order Confirmation

After the installation was complete, DirecTV mailed Perez a document DirecTV calls an Order Confirmation. (Robson Decl., Ex. 2.) It is addressed to Perez and titled "THANK YOU FOR YOUR ORDER." (Id.) In a bolded text box, the Order Confirmation tells Perez "This is Not a Bill" and provides an "estimated first bill." (Id.) The Order Confirmation incorrectly assumes that no installation has yet taken place and tells her to "call [her] local DirecTV dealer to schedule [her] installation." (Id.) It also tells her to update her email address and to review her customer agreements. (Id.) It reminds her that she agreed to a "24-**MONTH SERVICE AGREEMENT**," and if she fails to maintain the agreed-upon level of programming, DirecTV may charge her an early cancellation fee. (Id.)

### 2. The Customer Agreement

According to DirecTV, Perez would have received the Customer Agreement in the mail with the Order Confirmation after the equipment was installed. (Robson Decl. ¶ 11.)

Near the top of the first page, the Customer Agreement states:

> **THIS DESCRIBES THE TERMS AND CONDITIONS OF YOUR RECEIPT OF AND PAYMENT FOR DIRECTV® SERVICE AND IS SUBJECT TO ARBITRATION (SECTION 9) AND DISCLAIMER OF WARRANTIES (SECTION 8). IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR ORDER OR SERVICE. IF YOU INSTEAD DECIDE TO RECEIVE OUR SERVICE, IT WILL MEAN THAT YOU ACCEPT THESE TERMS AND THEY WILL BE LEGALLY BINDING. IF YOU OBTAINED RECEIVING**

(Robson Decl., Ex. 3.) Section 9, titled **"RESOLVING DISPUTES "** begins with the following statement:

> In order to expedite and control the cost of disputes, you and we agree that any legal or equitable claim relating to this Agreement, any addendum, or your Service (referred to as a "Claim") will be resolved as follows:

(Id.) Subsection (a) then sets forth the procedure for informal resolution, and subsection (b) provides that if informal resolution fails, "any Claim either of us asserts will be resolved only by binding arbitration." (Id.)

However, subsection (d) identifies two exceptions to the binding arbitration requirement:

> (i) Exceptions. Notwithstanding the foregoing (i) any Claim based on Section 1(h) above, and (ii) any dispute involving a violation of the Communications Act of 1934, 47 U.S.C. § 605, the Digital Millennium Copyright Act, 17 U.S.C. § 1201, the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 or any other statement or law governing theft of service, may be decided only by a court of competent jurisdiction. You may also assert an individual action in small claims court in lieu of arbitration.

(*Id.*) Section 1(h) is the third paragraph of the fourth column on the first page of the Customer Agreement. (*Id.*) It states:

> (h) Private Viewing. We provide Service only for your private non-commercial use, enjoyment and home viewing. The programming may not be viewed in areas open to the public or in commercial establishments. You may not rebroadcast, transmit or perform the programming, charge admission for its viewing or transmit or distribute running account of it. You may not use any of our trademarks. Notwithstanding the provisions of Section 9, we or any programming provider may prosecute violations of the foregoing against you and other responsible parties in any court of competent jurisdiction, under the rules and regulations of the Federal Communications Commission and other applicable laws.

(*Id.*)

From at least September 2014 until August 2015, when Perez cancelled her DirecTV service, Perez received monthly invoices in Spanish stating that the Customer Agreement describes the terms and conditions of service, and telling Perez to consult that Customer Agreement for complete information about billing and payment. (Kellogg Decl., Ex. 1, Doc. 18–3.) DirecTV also mailed Perez a copy of the Customer Agreement each time the Agreement was updated. (Robson Decl. ¶ 14.)

## D. Threatened Litigation and Settlement

In May 2015, Perez received a call from DirecTV advising her that the Lonstein Law Office had been retained by DirecTV regarding "the unauthorized reception and commercial display of DIRECTV programming" at her business. (Compl. ¶ 27, Doc. 1.) In that call, DirecTV alleged that on April 8, 2015, an "independent auditor" had observed and recorded Perez's unauthorized use of DirecTV's services. (*Id.*) Based on these allegations, DirecTV

threatened litigation if Perez did not contact the Lonstein Law Office within seven days to resolve the matter. (*Id.*) On June 26, 2015, Perez received a letter from the Lonstein Law Office with a proposed settlement agreement. (*Id.* ¶ 28.) The proposed settlement made it clear that the business where the purported unauthorized reception and display took place was the very same location where the DirecTV representative had installed the equipment. (Compl., Ex. B, "Settlement Agreement" at 1, Doc. 1–2.) Under the terms of the proposed settlement, DirecTV would release its claims against Perez in return for a $5,000 payment. (Settlement Agreement at 2.) Pursuant to the settlement agreement, Perez began making monthly payments of $500 to DirecTV. (Compl. ¶ 29.)

Perez later filed the instant class action on August 4, 2016, alleging violations of the California Unfair Competition Law and the RICO Act. (*Id.* ¶¶ 57–99.) She alleges that Defendants engage in a scheme of targeting small business owners through unsolicited sales campaigns to sell satellite cable television services. (*Id.* ¶ 2.) The scheme begins with DirecTV representa-

tives targeting and soliciting small, minority-owned businesses to purchase DirecTV's satellite cable television services at a special rate. (*Id.* ¶ 60.) After the business owners agree to purchase DirecTV's services, DirecTV installs the necessary equipment at their place of business. (*Id.*) DirecTV then provides services to these businesses under a residential account. (*Id.*) Later, DirecTV sends "independent" auditors to these businesses for a "signal audit," whereupon it is "discovered" that the business owners are "pirating" or "stealing" DirecTV's services by using residential services for commercial use. (*Id.* ¶¶ 5–6, 60.) Based on this information, DirecTV, through the Lonstein Defendants, threatens these small business owners with litigation unless they agree to a settlement. (*Id.* ¶¶ 6, 60.) In this way, Perez alleges, Defendants obtain money from these small business owners in addition to the monthly fees they already pay for DirecTV's satellite cable television services. (*Id.* ¶ 7.)

Based on the ELA and the Customer Agreement, DirecTV, Lonstein Law Offices, and Julie Cohen Lonstein move to compel this action to arbitration and stay proceedings in this Court. (DirecTV Mot., Doc. 18; Lonstein Mot., Doc. 20)

### III. LEGAL STANDARD

▇ Congress enacted the Federal Arbitration Act "in 1925 as a response to judicial hostility to arbitration." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 97, 132 S.Ct. 665, 181 L.Ed.2d 586 (2012). The FAA provides that an agreement to arbitrate disputes arising from "a contract evidencing a transaction involving commerce" shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The court's role under the Act is ... limited to deter-

mining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The "party seeking to compel arbitration has the burden under the FAA to show [these two elements]." *Ashbey v. Archstone Property Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), *superseded by statute on other grounds*. However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Arbitration agreements may also "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)).

▇ In these analyses, a court may consider evidence outside of the pleadings, such as declarations and other documents filed with the court, using "a standard similar to the summary judgment standard of [Federal Rule of Civil Procedure 56]." *Concat LP v. Unilever, PLC*, 350 F.Supp.2d 796, 804 (N.D. Cal. 2004); *see also Geographic Expeditions, Inc. v. Estate of Lhotka ex rel. Lhotka*, 599 F.3d 1102, 1104 n.1 (9th Cir. 2010) ("We take ... facts from the First Amended Com-

plaint, on file in the district court, and declarations filed in support of and in opposition to the motion to dismiss. All are part of our record.").

## IV. DISCUSSION

### A. Agreement to Arbitrate

 "The threshold issue in deciding a motion to compel arbitration is 'whether the parties agreed to arbitrate.'" *Quevedo v. Macy's, Inc.*, 798 F.Supp.2d 1122, 1133 (C.D. Cal. 2011) (quoting *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 756 (9th Cir. 1988)). "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (alteration in original) (quoting *United Steelworkers*, 363 U.S. at 582, 80 S.Ct. 1347). "When determining whether a valid contract to arbitrate exists, we apply ordinary state law principles that govern contract formation." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014) (citing *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002)).

 "It is undisputed that under California law, mutual assent is a required element of contract formation." *Knutson*, 771 F.3d at 565. The mutual assent necessary to form a contract "is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Deleon v. Verizon Wireless, LLC*, 207 Cal. App.4th 800, 813, 143 Cal.Rptr.3d 810 (2012) (citation and internal quotation marks omitted). The doctrine of mutual assent applies with particular force to contracts of adhesion. *See Knutson*, 771 F.3d at 566. Thus, "[a]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual

provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Id.* "[T]he party seeking to compel arbitration[ ] has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Id.* at 565 (citing *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal.4th 394, 413, 58 Cal.Rptr.2d 875, 926 P.2d 1061 (1996)).

Before addressing whether DirecTV has met its burden, the Court makes one initial observation: the manner in which Perez was provided these documents deviates sharply from the manner in which they were intended to be provided to ordinary residential customers. The language of the documents reveal that, ordinarily, the consumer placed an order for service with DirecTV; was mailed or emailed the operative contract—a "Customer Agreement"—for review and approval before the order for service was final; was instructed in a document called an "Order Confirmation" on how to arrange installation of the equipment; and, at the time of installation, was provided an addendum, called the "Equipment Lease Agreement," by the installer relating to equipment and other terms and conditions of service. In that context, the consumer is told upfront in the Customer Agreement that the consumer is agreeing to arbitration and specifically that "ARBITRATION MEANS THAT YOU WAIVE YOUR RIGHT TO A JURY TRIAL." (Robson Decl., Ex. 3.) The consumer is also told that she cannot bring any class actions or class arbitrations against DirecTV, but only individual arbitrations. (*Id.*) And the consumer is told that certain claims are not subject to the arbitration provision and may be litigated. (*Id.*) The consumer is further told that if she does not agree with the terms of the Customer Agreement, she must notify DirecTV immediately because if she instead

"decide[s] to receive [DirecTV's] service," the terms are legally binding. (*Id.*)

Here, the declarations and other evidence show that DirecTV short-circuited that procedure by withholding the Customer Agreement at the time the deal was made and the equipment installed, and providing Perez with only the ELA. Nonetheless, DirecTV contends that Perez agreed to arbitrate her claims in two different ways: (1) by signing the ELA, which contains an abbreviated arbitration provision; and (2) by later receiving the Customer Agreement from DirecTV with the full explanation of the arbitration terms and thereafter continuing to receive DirecTV's service. (DirecTV Mem. at 7–10, Doc. 18–1.)

### 1. Assent by Signing the ELA

DirecTV shows that Perez signed the ELA on the date she accepted DirecTV's promotional deal. (Robson Decl., Ex. 5.) The ELA's arbitration provision is a few sections above the signature line and simply states that the customer and DirecTV "agree that both parties will resolve any dispute under this ELA, the DIRECTV Customer Agreement, or regarding [the customer's] DIRECTV service, through binding arbitration as fully set forth in the DIRECTV Customer Agreement." (*Id.*) Because the arbitration provision refers to terms set forth in a separate document— the Customer Agreement—the first question is whether that document has been properly incorporated into the ELA by reference.

 For an agreement to incorporate the terms of another document by reference, (1) "the reference must be clear and unequivocal"; (2) "the reference must be

called to the attention of the other party and he must consent thereto"; and (3) "the terms of the incorporated document must be known or easily available to the contracting parties." *Shaw v. Regents of Univ. of Cal.*, 58 Cal.App.4th 44, 54, 67 Cal. Rptr.2d 850 (1997).

 As to the first element, the ELA references a "DIRECTV Customer Agreement" in its arbitration provision. (Robson Decl., Ex. 5.) However, the ELA also informs Perez that she has "already received" that Customer Agreement, a fact that DirecTV admits in its papers is not true. (*See* Robson Decl. ¶¶ 4–5, 11.) Hence, it would not be clear to a reasonable person reviewing the ELA what document is being referenced. Perez undoubtedly was signing the ELA as a "customer" of DirecTV, and the ELA is clearly an "agreement." A person reviewing the arbitration provision in the context in which it was provided to Perez could reasonably believe that the ELA and the Customer Agreement were one and the same and the reference to a "Customer Agreement" was simply another way of describing the ELA. This is particularly true where, as here, the ELA was the only agreement Perez received and could easily appear to the consumer to be the complete agreement.[3] Indeed—unlike its title suggests—the ELA not only discusses the terms of the equipment lease, it also contains a lengthy provision titled "PROGRAM AGREEMENT AND TERM," which discusses in great detail the cost of the programming, the agreed-upon term, and the early cancellation fees that will be charged. (Robson Decl., Ex. 5.) Therefore, the reference to a separate Customer Agreement with addi-

---

**3.** Ordinarily, the Court might give some weight to an earlier reference in the ELA to the DirecTV Customer Agreement that appears to describe it as a separate document. However, in the present case, the facts show that the DirecTV representative handwrote account information across that section of the ELA, and it is not at all legible. (Robson Decl., Ex. 5.)

tional terms was not clear and unequivocal. Although the lack of a clear and unequivocal reference is sufficient to find the Customer Agreement was not incorporated by reference, the Court also analyzes the remaining elements.

The second element is whether the reference was called to Perez's attention and whether Perez consented to it. The reference to arbitration and the Customer Agreement is set apart in its own section and the word "arbitration" is in bold, underline, and all caps. (Robson Decl., Ex. 5.) Moreover, the reference is near the bottom of the page and is close to the line where Perez placed her signature. (*Id.*) With respect to whether the reference was called to Perez's attention, the second element appears to be satisfied. However, whether Perez consented to the referenced terms is doubtful because the third element—that the terms of the incorporated document were known or easily available to the contracting parties—was not met.

Perez was not provided with the Customer Agreement at the time she signed the ELA. (Perez Decl. ¶ 6.) DirecTV has made clear that the Customer Agreement was mailed to Perez after the DirecTV equipment was installed and her service was activated, (Robson Decl. ¶¶ 11–12), and DirecTV has failed to show that Perez had otherwise been made aware of its terms when she signed the ELA. Moreover, DirecTV has failed to show that the Customer Agreement was easily available to Perez at the time she signed the ELA. DirecTV does not assert that the representative who set up the DirecTV equipment for Perez had a copy of the Customer Agreement to give her, but rather acknowledges that it was provided on a later date. The ELA states that the Customer Agreement is available at www. directv.com/legal, (Robson Decl., Ex. 4), but there is no evidence that Perez had easy access to the Internet at the time the ELA was presented to her.[4] At that time, Perez was in her beauty salon, and the DirecTV representative had just finished installing the equipment at her place of business. Because DirecTV has failed to meet its burden of proving that the Customer Agreement was otherwise known or easily available to Perez at the time she agreed to subscribe to DirecTV's services, the Customer Agreement was not properly incorporated by reference into the ELA.

Having failed to properly incorporate the Customer Agreement into the ELA, the mutual intention of the parties with respect to arbitration, and the scope thereof, becomes ambiguous. Because "the intention of the parties is to be ascertained from the writing alone, if possible," Cal. Civ. Code § 1639, the failure to properly incorporate the Customer Agreement by reference means there is no ascertainable, mutual intention as to what the parties have agreed to arbitrate. The ELA states that "both parties will resolve any dispute under this ELA, the DIRECTV Customer Agreement, or, regarding your DIRECTV service, through binding arbitration as fully set forth in the DIRECTV Customer Agreement." (Robson Decl., Ex. 5.) Hence, a reasonable customer reviewing the ELA would likely believe that *"both parties"* agreed to resolve *"any* dispute" under the ELA or the Customer Agreement, using a binding arbitration procedure set forth in the Customer Agreement. A quick review of the later-provided Customer Agreement demonstrates that is not the case. As described in Section II.C.2 above, DirecTV's

---

4. Moreover, the ELA's reference to the agreement being available on the DirecTV website is not legible on the copy of the ELA signed by Perez, as the DirecTV representative handwrote account information across that section of the ELA. (*See* Robson Decl., Ex. 5.)

intent was to carve out certain disputes as not subject to arbitration and—particularly relevant to this case—to except from arbitration disputes over commercial viewing of DirecTV programming. Section 1(h) of the Customer Agreement allows DirecTV to "prosecute [commercial viewing claims] against [the customer] in any court of competent jurisdiction." (Robson Decl., Ex. 3.) This significant carve-out simply illustrates that a customer reviewing the ELA in the absence of the Customer Agreement could not possibly understand the scope of arbitration as intended by DirecTV.

Accordingly, the Court finds that Perez's signing of the ELA fails to establish a clear agreement to arbitrate disputes with DirecTV.

### 2. Assent by Silence

■ DirecTV also argues that Perez accepted the arbitration terms of the later-mailed Customer Agreement because that document informed her that by receiving services she would be deemed to accept the terms and conditions contained therein. (DirecTV Mem. at 7–10.) DirecTV's argument is unpersuasive for several reasons.

■ First, mere silence or inaction in the face of the offer of a contract does not ordinarily amount to an acceptance. *Wold v. League of Cross of Archdiocese of San Francisco*, 114 Cal.App. 474, 479, 300 P. 57 (1931). While California law identifies two exceptions to this rule—inaction in the face of a duty to act or retention of a benefit

offered, *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal.App.4th 1372, 1386, 25 Cal.Rptr.2d 242 (1993)—neither applies here. As to the first exception, DirecTV does not argue that Perez had a duty to act, and this Court finds no basis for one.[5] The second exception is grounded in California Civil Code Section 1589, which states that "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." The problem with DirecTV's reliance on this provision of California law is that the offer was made and accepted at the time the DirecTV representative came to Perez's place of business, sold her the 24–month package, installed the equipment, and had her sign one and only one document: the ELA. The ELA does not contain any statement that the contractual terms between Perez and DirecTV are subject to change in the future or that Perez agrees that DirecTV can change the terms of her service without any affirmative action on her part. (*See* Robson Decl., Ex. 4.) DirecTV has failed to show that the arbitration provisions in the Customer Agreement were known to Perez or that she ought to have known of them at the time of the transaction.[6]

The cases DirecTV cites do not compel a contrary finding. In *Brown v. DIRECTV, LLC*, the plaintiff placed an order for DirecTV service online and he could easily access the Customer Agreement through a

---

**5.** A duty to act may arise from the circumstances of the relationship or a previous course of dealing between the parties. *See Beatty Safway Scaffold, Inc. v. Skrable*, 180 Cal.App.2d 650, 655, 4 Cal.Rptr. 543 (1960). DirecTV points to no such relationship or course of dealing.

**6.** Indeed, DirecTV tacitly acknowledges this problem by attempting to rearrange the chronology of events in its brief. Having already acknowledged that the Customer Agreement was provided to Perez after the deal was struck and the equipment installed, DirecTV's "acceptance by silence" argument rests on the incorrect factual premise that Perez received the Customer Agreement first, then had the equipment installed and began service. (*See* DirecTV Mem. at 8.)

hyperlink presented to him at checkout. No. CV 12-08382 DMG (Ex), 2013 WL 3273811, at *1–2, *4 (C.D. Cal. Jun. 26, 2013). In other cases cited by DirecTV, the plaintiff placed an order for DirecTV service, was immediately mailed the contract thereafter, and then later installed the equipment and began service. *See Stachurski v. DirecTV, Inc.*, 642 F.Supp.2d 758, 761–62 (N.D. Ohio 2009) (plaintiff placed order over the phone, contract was mailed the next day, and equipment and service was installed over a month later); *Ferrie v. DirecTV, LLC*, No. 3:15-CV-409 (JCH), 2016 WL 183474, at *2–3 (D. Conn. Jan. 12, 2016) (plaintiff placed order over the phone on June 25, the contract was emailed immediately after the call and also mailed to plaintiff the next day, and equipment and service was installed on July 1). In yet other cases, the issue of acceptance by inaction or silence is not discussed at all. *See generally Joaquin v. DIRECTV Group Holdings, Inc.*, No. 15-8194 (MAS) (DEA), 2016 WL 4547150 (D.N.J. Aug. 30, 2016); *Murphy v. DIRECTV, Inc.*, No. 2:07–cv–06465–JHN–VBKx, 2011 WL 3319574 (C.D. Cal. Aug. 2, 2011). Although the court in *Truitt v. DirecTV, Inc.* raised the issue of acceptance by silence or inaction, the court in that case was applying Louisiana civil law. No. 08-3782, 2008 WL 5054570, at *3 (E.D. La. Nov. 21, 2008).

Finally, the court in *Bischoff v. DirecTV, Inc.* cited "practical business realities" in finding the delayed delivery of the DirecTV Customer Agreement permissible. 180 F.Supp.2d 1097, 1105 (C.D. Cal. 2002). Relying on *Hill, et al. v. Gateway 2000*, 105 F.3d 1147 (7th Cir. 1997), the *Bischoff* court determined that it was "unrealistic to expect DirecTV … to negotiate all of the terms of [its] customer contracts, including arbitration provisions, with each customer before initiating service." However, there are two fundamental problems with a "business practicalities" argument. First, at least in California, the legislature has not carved out a "business practicalities" exception to the rules governing contract formation. *See Norcia v. Samsung Telecommunications America, LLC*, 845 F.3d 1279, 1290 (9th Cir. 2017). In other words, while California law recognizes that the more powerful party may impose a contract of adhesion (*i.e.*, a "take-it-or-leave-it" contract) on the weaker party, it has yet to decide that the more powerful party may do so at some time after the deal has been struck simply because it serves a "practical business reality." Hence, District Court decisions citing to the Seventh Circuit *Hill* decision in reliance on such a standard are of little persuasive value.[7]

Second, DirecTV can point to no such practical business reality here. This was an old-fashioned, face-to-face transaction between Perez and a DirecTV representative. DirecTV has offered no valid business reason why the DirecTV representative—who not only installed the equipment, but also sold Perez on the terms of service—had the ELA available for Perez to review and sign but could not have had the Customer Agreement available for Perez's review as well. Accordingly, the Court finds that Perez's inaction after receiving DirecTV's Customer Agreement fails to establish a clear agreement to arbitrate disputes with DirecTV.

7. For the same reason, the Court finds unpersuasive the recent decision in the Northern District of Illinois that DirecTV brings to the Court's attention. *See G & G Closed Circuit Events, LLC v. Castillo*, No. 14-CV-02073, 2017 WL 1079241, at *7 (N.D. Ill. Mar. 22, 2017) (citing *Bischoff* and other Seventh Circuit cases and concluding third-party claimants assented to the terms of the Customer Agreement because at some point while receiving DirecTV services, they were "sent notice pointing to the Customer Agreement").

In sum, the Court concludes that the parties did not enter into a valid agreement to arbitrate.

## B. Scope of the Agreement

Even assuming, arguendo, one could find a clear agreement to arbitrate, Perez's claim would fall outside the scope of the arbitration agreement. Where an agreement to arbitrate exists, the party seeking to compel arbitration must demonstrate that the arbitration agreement encompasses the dispute at issue. *Chiron Corp.*, 207 F.3d at 1130. "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. 927. "Absent some ambiguity in the agreement, however, it is the language of the contract that defines the scope of disputes subject to arbitration..... For nothing in the statute authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (citation omitted).

Here, Section 9(d) of the Customer Agreement creates an exception to arbitration for any claim based on Section 1(h) of the Agreement, or for "any dispute involving ... any ... statement ... governing theft of service." (Robson Decl., Ex. 3.) Section 1(h) sets forth the terms and conditions of Perez's subscription as it relates to her use of DirecTV's services and where and how she can view DirecTV programming. (*Id.*) Specifically, Section 1(h) prohibits the customer from allowing DirecTV programming to be viewed in a commercial establishment. (*Id.*) The terms and conditions of Section 1(h) are at the

core of Perez's claims against DirecTV. Perez alleges that DirecTV targets small business owners through unsolicited sales campaigns to sell satellite cable television services, and then it provides satellite cable television services to those businesses under a residential account that prohibits the use of DirecTV in commercial establishments. (Compl. ¶¶ 2, 60.) Based on this "misuse," DirecTV threatens these small business owners with litigation unless they agree to a settlement. (*Id.* ¶¶ 6, 60.) Section 1(h) is the only term in the Customer Agreement that pertains to the use of DirecTV services in public or commercial spaces. (*See* Robson Decl., Ex. 3.) In fact, DirecTV was able to threaten Perez with litigation (as opposed to arbitration) over commercial use only because of the Section 1(h) exception.

DirecTV's carve-out from arbitration of any disputes "involving ... any ... statement ... governing theft of service" is even broader and also directly applicable. Indeed, Perez's Complaint alleges that DirecTV's scheme consisted of manufacturing a "finding that Plaintiff had 'pirated' or 'stolen' satellite cable television services from DirecTV" and then using that manufactured finding to threaten Plaintiff with prosecution for the purported theft of service in order to extort a settlement from Plaintiff. (Compl. ¶ 60.) Ignoring the alleged scope of the scheme, DirecTV attempts to recast Perez's claims as based solely on DirecTV's solicitation of Perez's business and the classification of her account. (*See* DirecTV Mem. at 1.) Then, based on that strawman version of her claims, DirecTV argues that the claims fall directly within the scope of the arbitration provision. (*See id.* at 2.) However, the gravamen of Perez's allegation is not simply that DirecTV improperly sells residential service to minority-owned businesses—it is that DirecTV conducts a scheme that posi-

tions it to falsely claim theft of service, then extort settlements from minority-owned businesses through threats of prosecution. As such, Perez's claim turns on "statement[s] ... governing theft of service."

DirecTV's briefing buttresses the conclusion that Perez's claims fall within the "theft of service" carve-out. In attempting to illustrate the mutuality of the carve-out, DirecTV declares that Section 9(d) "permits both DIRECTV and Ms. Perez to *litigate the same range* of disputes related to the theft of DIRECTV service." (DirecTV Reply at 12 (emphasis added).) In 2015, DirecTV threatened Perez with litigation over "theft of services" based on the carve-out, (Compl. ¶ 27), and any counterclaim by Perez alleging that DirecTV's theft-of-service claim was part of an extortionate scheme would have been a compulsory counterclaim within the "same range of disputes." *See* Fed. R. Civ. P. 13(a). The plain meaning of the arbitration carve-out is no different merely because of the procedural posture of this case.

Accordingly, even if there were an agreement to arbitrate between Perez and DirecTV, Perez's claims in this action would fall within the scope of the arbitration carve-out provision.

### C. Validity of the Agreement

■■■ A contrary interpretation of the Section 9(d) exceptions would render the arbitration agreement unconscionable. "[A]rbitration agreements are valid, irrevocable and enforceable except upon grounds that exist for revocation of the contract generally." *Serpa v. Cal. Surety Investigations, Inc.*, 215 Cal.App.4th 695, 701–02, 155 Cal.Rptr.3d 506 (2013) (citations omitted). The party challenging the validity of the arbitration agreement bears the burden of proof. *See Szetela v. Discover Bank*, 97 Cal.App.4th 1094, 1099, 118

Cal.Rptr.2d 862 (2002) (citing *Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 972, 64 Cal.Rptr.2d 843, 938 P.2d 903 (1997)). Under California law, a contract is not enforceable if it is found to be unconscionable. *See id.*

■■■ "Unconscionability under California law 'has both a procedural and a substantive element,'" and "[c]ourts use a 'sliding scale' in analyzing these two elements." *Kilgore v. KeyBank, N.A.*, 673 F.3d 947, 963 (9th Cir. 2012) (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000), *abrogated on other grounds by AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011)). "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz*, 24 Cal.4th at 114, 99 Cal.Rptr.2d 745, 6 P.3d 669. "No matter how heavily one side of the scale tips, however, both procedural and substantive unconscionability are required for a court to hold an arbitration agreement unenforceable." *Kilgore*, 673 F.3d at 963 (emphasis omitted) (citing *Armendariz*, 24 Cal.4th at 114, 99 Cal.Rptr.2d 745, 6 P.3d 669).

### 1. Procedural Unconscionability

■■■ Under California law, "[p]rocedural unconscionability concerns the manner in which the contract was negotiated and the respective circumstances of the parties at that time, focusing on the level of oppression and surprise involved in the agreement." *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013) (citing *Ferguson*, 298 F.3d at 783). "Oppression addresses the weaker party's absence of choice and unequal bargaining power that results in 'no real negotiation.'" *Id.*

(quoting *A & M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473, 486, 186 Cal. Rptr. 114 (1982)). "Surprise involves the extent to which the contract clearly discloses its terms as well as the reasonable expectation of the weaker party." *Id.* (citing *Parada v. Super. Ct.*, 176 Cal.App.4th 1554, 1571, 98 Cal.Rptr.3d 743 (2009)).

■ "Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion." *Armendariz*, 24 Cal.4th at 113, 99 Cal.Rptr.2d 745, 6 P.3d 669 (citation omitted). A contract is procedurally unconscionable under California law if it is "a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 996 (9th Cir. 2010) (citation omitted), *abrogated on other grounds as recognized in Poublon v. C.H. Robinson Co.*, 846 F.3d 1251 (9th Cir. 2017). Here, DirecTV's ELA and Customer Agreement qualify as contracts of adhesion. There is no indication that Perez or any other potential DirecTV customer can negotiate the terms of either contract if they want to subscribe to DirecTV's services. Rather, both the ELA and Customer Agreement are form contracts that are presented to potential subscribers on a take-it-or-leave-it basis.

Although the contract is adhesive, without more, the degree of procedural unconscionability is low. *Poublon*, 846 F.3d at 1261–62 (citing *Baltazar v. Forever 21, Inc.*, 62 Cal.4th 1237, 1245, 200 Cal.Rptr.3d 7, 367 P.3d 6 (2016)). Accordingly, the Court considers whether other "other indications of oppression or surprise [exist] that would lead California courts to conclude that the degree of procedural unconscionability is high." *Id.* at 1262.

a. The Terms of the Deal Were Discussed in Spanish, the Arbitration Agreement was Presented in English, and the Terms of the Arbitration Agreement Were Not Otherwise Explained to Perez.

■ DirecTV argues that an agreement is not unenforceable simply because it is presented in a language other than the one spoken by Perez. *See* DirecTV Reply at 4. That is correct as far as it goes; one cannot disclaim assent to the terms of a contract on the ground that one could not read it. *See Randas v. YMCA of Metro. L.A.*, 17 Cal.App.4th 158, 163, 21 Cal.Rptr.2d 245 (1993); *Chico v. Hilton Worldwide, Inc.*, No. CV 14-5750-JFW (SSx), 2014 WL 5088240, at *6 (C.D. Cal. Oct. 7, 2014); *Molina v. Scandinavian Designs, Inc.*, No. 13-cv-04256 NC, 2014 WL 1615177, at *3 (N.D. Cal. Apr. 21, 2014). However, the issue is not contract formation; it is whether the manner in which the agreement was negotiated elevates its procedural unconscionability. Although inability to read an agreement does not prevent contract formation, it is still a factor that increases procedural unconscionability when other indications of oppression and surprise are present. *See, e.g.*, *Saravia v. Dynamex, Inc.*, 310 F.R.D. 412, 420 (N.D. Cal. 2015) (finding procedural unconscionability, in part, because the agreements were "written in English although [the defendant] knew that [the plaintiff's] comprehension of English was limited"); *Chico*, 2014 WL 5088240, at *8 (stating that if the defendants had not given the plaintiff "an opportunity to … obtain a Spanish translation … it would further support Plaintiff's claim of procedural unconscionability").

Here, Perez's conversation with the DirecTV representative was completely in Spanish from the moment he walked into her beauty salon until he completed the

equipment installation, activated her service, and handed her the ELA. (Perez Decl. ¶ 6.) Although the representative had been speaking with Perez in Spanish, and DirecTV had Spanish-language versions of the ELA, the representative provided Perez with an ELA printed in English, a language she had difficulty reading. (*Id.*; Robson Decl., Ex. 4 at 2; Robson Decl., Ex. 5.) Even though Perez could not understand the terms of the ELA, the DirecTV representative did not explain those terms to her. (Perez Decl. ¶ 6.) Moreover, the representative gave Perez the ELA to sign at the end of their encounter; after the DirecTV equipment had been installed, after Perez had provided her business bank account information, and after the service had been activated. (*Id.*; Robson Decl. ¶ 12.) There is no indication that Perez had a realistic opportunity to obtain a Spanish translation or otherwise ask for an explanation of the ELA's terms. The Court finds these circumstances increase the level of oppression and surprise in Perez's interactions with DirecTV and therefore increase the level of procedural unconscionability.

b. The Terms of the Arbitration Agreement Were Withheld.

The ELA does not include what DirecTV now argues is the complete arbitration agreement. The Court has addressed this issue in the context of the validity of the arbitration agreement, but it also applies in determining procedural unconscionability. Namely, among other things, the ELA did not advise Perez that she was waiving her Seventh Amendment right to a jury trial, that she agreed to forego any right to proceed as a class, and that she agreed that DirecTV could carve out certain claims from the arbitration agreement and pursue those in court. Nor has DirecTV provided any valid reason for withholding the complete terms of the arbitration agreement. DirecTV's manner of presenting the complete arbitration agreement at a later date results in just the kind of unfair surprise that courts have held results in an increased degree of procedural unconscionability.[8] *See Chavarria*, 733 F.3d at 923 ("[T]he degree of procedural unconscionability is enhanced when a contract binds an individual to later-provided terms."); *Pokorny*, 601 F.3d at 997 (stating that the failure to attach a "full description of the non-binding conciliation and binding arbitration processes" increased the degree of procedural unconscionability); *Milliner v. Bock Evans Fin. Counsel, Ltd.*, 114 F.Supp.3d 871, 879 (N.D. Cal. 2015) (finding increased procedural unconscionability where the arbitration agreement did not provide the applicable arbitration rules and did not otherwise indicate where the plaintiffs could find them); *Fox v. Vision Service Plan*, No. 2:16-cv-2456-JAM-DB, 2017 WL 735735, at *6 (E.D. Cal. Feb. 23, 2017) (finding that failure to attach terms to the contract increased procedural unconscionability where the contract contained no instructions on how to obtain the omitted terms); *cf. Merkin v. Vonage America, Inc.*, 639 Fed.Appx. 481, 482 (9th Cir. 2016) (quoting *Chavarria*'s text that procedural unconscionability is enhanced when a contract binds an individual to later-provided terms). That is particularly true in this instance because the ELA informs Perez that if she subsequently cancels her service, she is subject to a hefty cancellation fee. (Robson Decl., Ex. 5.) DirecTV points to nothing in any

---

8. Unlike in *Poublon v. C.H. Robinson Co.*, this is not a case where surprise or oppression is absent because the terms were properly incorporated by reference. *See* 846 F.3d at 1262 (stating that "incorporation by reference, without more, does not affect the finding of procedural unconscionability").

agreement that would allow Perez to avoid that fee if she were to discontinue service based on the later-provided terms of arbitration.

c. The Early Cancellation Fee Term in the ELA Exerts Additional Pressure on Perez to "Accept" Terms of the Arbitration Agreement.

The manner in which DirecTV provided Perez with the ELA and the Customer Agreement exerted additional pressure on Perez to "accept" the terms of the arbitration agreement. At the installation of her DirecTV equipment, DirecTV provided Perez with only the ELA. (Perez Decl. ¶ 6; Robson Decl., Ex. 5; Robson Decl. ¶ 8.) The ELA includes a paragraph that tells the consumer that if she cancels service before the end of a two-year term, she will be charged an early cancellation fee of up to $480. (Robson Decl., Ex. 5.) By the time Perez received the Customer Agreement and its additional terms, she was already receiving DirecTV programming. (See Robson Decl. ¶¶ 11–12.) To the extent Perez was dissatisfied with the terms of the Customer Agreement, the early cancellation fee provision in the ELA would exert pressure on Perez to maintain service unless she was willing to potentially pay up to $480 to get out of her contract.[9]

In light of all the aforementioned factors, the Court finds that the arbitration agreement here has a high degree of procedural unconscionability.

2. Substantive Unconscionability

 "Substantive unconscionability addresses the fairness of the term in dispute." *Pokorny*, 601 F.3d at 997 (quoting *Szetela*, 97 Cal.App.4th at 1100, 118 Cal. Rptr.2d 862). Under California law, "[a] provision is substantively unconscionable if it 'involves contract terms that are so one-

sided as to "shock the conscience," or that impose harsh or oppressive terms.' " *Parada*, 176 Cal.App.4th at 1573, 98 Cal. Rptr.3d 743 (quoting *Morris v. Redwood Empire Bancorp*, 128 Cal.App.4th 1305, 1322, 27 Cal.Rptr.3d 797 (2005)). "Thus, mutuality is the 'paramount' consideration when assessing substantive unconscionability." *Pokorny*, 601 F.3d at 997–98 (quoting *Abramson v. Juniper Networks, Inc.*, 115 Cal.App.4th 638, 657, 9 Cal.Rptr.3d 422 (2004)). In the context of arbitration agreements, "it is unfairly one-sided for [a party] with superior bargaining power to impose arbitration on the [other party] as plaintiff but not to accept such limitations when it seeks to prosecute a claim against [that party], without at least some reasonable justification for such one-sidedness." *Armendariz*, 24 Cal.4th at 117, 99 Cal. Rptr.2d 745, 6 P.3d 669.

 Here, DirecTV has crafted the agreement to exempt from arbitration its claim under Section 1(h) alleging that Perez improperly allowed commercial viewing of DirecTV programming. However, according to DirecTV, Perez must arbitrate any claim that the prohibition on commercial viewing in Section 1(h) was part of DirecTV's scheme to defraud small business owners. Under this interpretation, the lack of mutuality is abundantly clear: DirecTV can sue—or as alleged here, threaten suit—against customers for permitting commercial viewing of DirecTV programming in violation of Section 1(h), but any customer counterclaim alleging that Section 1(h) is invalid as part of a fraudulent scheme must be arbitrated.

As interpreted by DirecTV, one-sidedness also exists with respect to the "theft of service" exception in Section 9(d) of the Customer Agreement. Because DirecTV is the service provider in this relationship,

---

9. This case differs from *Castillo* in that respect. There, the court found that the plaintiffs had failed to identify any extra costs they

would have incurred had they chosen to cancel their DirecTV service. 2017 WL 1079241, at *8.

any claim involving "theft of service" would be brought by DirecTV against Perez. Moreover, any claim DirecTV might conceivably bring against Perez that relates to the Customer Agreement, any addendum, or DirecTV's services, would involve Perez's misuse of or non-payment for (*i.e.*, theft of) those services. As such, it is hard to conceive of claims that DirecTV has against Perez that would *not* be exempt from arbitration.[10]

DirecTV first argues that one-sidedness is permissible because a contract can provide a "margin of safety" to the party with superior bargaining power. (DirecTV Reply at 11–12.) *See Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1031–32 (9th Cir. 2016); *Baltazar*, 62 Cal.4th at 1250, 200 Cal.Rptr.3d 7, 367 P.3d 6; *Armendariz*, 24 Cal.4th at 117, 99 Cal.Rptr.2d 745, 6 P.3d 669. However, in *Tompkins*, the provision at issue allowed 23andMe's *customers* to retain intellectual property rights, including rights in user-generated content and genetic information, and to bring suit in court against 23andMe to vindicate those rights. *Id.* There was nothing about the provision that obviously favored the drafting party. In fact, the plaintiffs in *Tompkins* did not identify any intellectual property claims that 23andMe was likely to bring against its customers. *Id.* Given these facts, the intellectual property provision contained "more than [the] 'modicum

of bilaterality'" required for a valid contract. *Id.* (quoting *Armendariz*, 24 Cal.4th at 117, 99 Cal.Rptr.2d 745, 6 P.3d 669). To the extent that *Tompkins* also validated a "margin of safety" doctrine, that doctrine does not swallow the rule. One searches DirecTV's arguments in vain to see how its sweeping exemptions from arbitration are consistent with retaining some limited margin of safety. Indeed, DirecTV has proffered no limiting principle.

Instead of explaining the contours of the "margin of safety," DirecTV pivots to its argument that requiring mutuality of obligation within an arbitration provision would impermissibly burden agreements to arbitrate and conflict with the federal policy favoring arbitration. (DirecTV Reply at 13.) This is simply an argument that DirecTV should not be limited to a "margin of safety" when drafting one-sided arbitration provisions. In short, under DirecTV's interpretation, there would be little difference between the exceptions as drafted and a provision in the Customer Agreement that explicitly requires only Perez to arbitrate her claims. A one-sided provision of such breadth and scope goes beyond simply preserving a "margin of safety" for DirecTV.

DirecTV intimates that the FAA preempts any examination of the bilaterality of an arbitration agreement in evaluating a contract's substantive unconscionabil-

---

**10.** The court in *Castillo* noted that "[d]istrict courts have upheld § 9 of DirecTV's Customer Agreement against substantive unconscionability challenges because : "it is conceivable that a [customer] might have a claim against" DirecTV for ... claims' under the laws listed in § 9(d)." 2017 WL 1079241, at *9 (citing cases). Tellingly, however, the *Castillo* court could not provide any concrete examples of such a claim, and acknowledged in a footnote that "[t]he cases interpreting DirecTV's [Customer] Agreement cited in the text do not offer any concrete examples of the sort of claim a consumer could bring under the exception in § 9(d)." *Id.* at *9 n.3. Nor has this

Court found any concrete examples in the cases it has reviewed. At oral argument, DirecTV's counsel stated that plaintiffs bring "a lot" of cases under the Electronic Communications Privacy Act, but "not necessarily against us." Such a vague statement fails to articulate any claim that a customer could bring *against DirecTV* under the exceptions listed in Section 9(d). The lack of any concrete examples despite the plethora of cases involving DirecTV's Customer Agreement suggests there may not be any claims that a customer could litigate against DirecTV under DirecTV's interpretation of Section 9(d).

ity. (*See* DirecTV Reply at 12–13.) Not so. California courts routinely consider mutuality not just of the one-sidedness of an arbitration provision, but also in considering other contractual provisions in contracts of adhesion that affect the vindication of substantive rights. For instance, California also deems unconscionable one-sided fee-shifting provisions in favor of the drafter of a contract of adhesion. *See, e.g., Carmona v. Lincoln Millennium Car Wash, Inc.*, 226 Cal.App.4th 74, 88, 171 Cal.Rptr.3d 42 (2014), *Samaniego v. Empire Today LLC*, 205 Cal.App.4th 1138, 1143, 140 Cal.Rptr.3d 492 (2012), *Ajamian v. CantorCO2e, L.P.*, 203 Cal.App.4th 771, 799–800, 137 Cal.Rptr.3d 773 (2012). California's substantive unconscionability doctrine, if it has any pronounceable effect, encourages arbitration by preventing a party with superior bargaining power from exempting itself entirely from the arbitration provision it imposes on its customers. And the doctrine does not evince a judicial hostility to arbitration; to the contrary, where a drafter of a contract of adhesion believes that arbitration is "good enough" for *all* consumer claims but not for *any* claims it may bring, it is the drafter who holds an aversion to arbitration.

Accordingly, under DirecTV's interpretation of its arbitration provisions, the Court would find the arbitration agreement so one-sided and lacking in mutuality as to be substantively unconscionable. When considered with the strong showing of procedural unconscionability discussed above, the Court finds that, if the arbitration carve-out is interpreted as advocated by DirecTV, the arbitration agreement between DirecTV and Perez is unenforceable. *See Armendariz*, 24 Cal.4th at 114, 99 Cal.Rptr.2d 745, 6 P.3d 669 ("[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.").

### 3. Severability

In California, when a court finds that a contract or any clause in the contract was unconscionable at the time it was made, the court "may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a). "A court may 'refuse to enforce the entire agreement' only when it is ' "permeated" by unconscionability.' " *Poublon*, 846 F.3d at 1272 (quoting *Armendariz*, 24 Cal.4th at 122, 99 Cal. Rptr.2d 745, 6 P.3d 669). A contract is permeated by unlawfulness when "[t]he good cannot be separated from the bad, or rather the bad enters into and permeates the whole contract, so that none of it can be said to be good." *Id.* (quoting *Keene v. Harling*, 61 Cal.2d 318, 322, 38 Cal.Rptr. 513, 392 P.2d 273 (1964)) (internal quotation marks omitted). "If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract," then severance is appropriate. *Marathon·Entm't, Inc. v. Blasi*, 42 Cal.4th 974, 996, 70 Cal.Rptr.3d 727, 174 P.3d 741 (2008) (quoting *Armendariz*, 24 Cal.4th at 124, 99 Cal.Rptr.2d 745, 6 P.3d 669).

Here, the Court has already noted that (1) the agreement was presented in English to a known Spanish-speaker at the end of a transaction conducted in Spanish; (2) although there was no reason to withhold the full terms of the arbitration agreement at the time the contract was entered, DirecTV nonetheless withheld them; (3) the manner in which DirecTV exempted itself from arbitration allowed it to threaten litigation for "theft of service" claims, but relegated (per DirecTV's interpretation) Perez to arbitration to argue

that the "theft of service" claims are part of a scheme. For these reasons, it is not possible to remove the unconscionable taint to the arbitration agreement through severance. *See Armendariz*, 24 Cal.4th at 124–25, 99 Cal.Rptr.2d 745, 6 P.3d 669 ("[P]ermeation is indicated by the fact that there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement.").

## V. CONCLUSION

For the reasons stated above, the Court DENIES Defendants' Motions to Compel Arbitration.[11]

11. In light of the Court's denial of Defendants' Motions on the grounds set forth in this Order, the Court does not reach those arguments relating solely to the ability of the Lonstein Defendants to enforce the DirecTV arbitration provision.